## SECURITIES AND EXCHANGE COMMISSION

v.

## Jonathan MAYHEW.

Civ. No. 3:94cv1322(JBA).

United States District Court,
D. Connecticut.

Dec. 27, 1995.

**124**

Robert Wilson, Thomas Sjoblom, Christian Mixter, Securities & Exchange Commission, Washington, DC, and John Hughes, Office of the U.S. Attorney, New Haven, CT, for plaintiff.

Elizabeth Grove and Victor Zimmermann, O'Rourke & O'Hanlan, New Canaan, CT, for defendant.

*OPINION AND ORDER*

ARTERTON, District Judge.

**I.  Introduction**

The Plaintiff Securities and Exchange Commission ("SEC") brought this action against Jonathan Mayhew, alleging that Defendant Mayhew's trading in stock of Rorer Group, Inc. between November 16, 1989 and January 15, 1990 constituted insider trading in violation of Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78n(e), and Rules 10b–5 and 14e–3 promulgated under the Exchange Act, 17 C.F.R. §§ 240.10b–5 and 240.14e–3.

This case was tried to the court on August 24, 25, and 28, 1995.  The Court, after considering the evidence and the legal positions in the parties' pre- and post-trial briefing, makes the following findings of facts and conclusions of law.

**II.  Findings of Fact**

1.  The defendant, Jonathan Mayhew, is a resident of Darien, Connecticut.  Following his employment as a corporate pilot, during

1989 and until 1991, defendant Mayhew traded securities full time for his own account, and maintained securities brokerage accounts with Oppenheimer & Co. and with Smith Barney, Inc.

2. In the course of his social life in Darien, and his employment as a corporate pilot and in real estate, defendant Mayhew met and came to know business consultants and chief executive officers of large corporations. Defendant Mayhew claims to have educated himself in stock markets and stock trading, and focused on the stock of companies which were potential takeover targets.

3. Rorer Group, Inc. was a Pennsylvania corporation, headquartered in Fort Washington, Pennsylvania, which developed, manufactured and marketed over-the-counter and prescription pharmaceuticals.

4. Rhône–Poulenc S.A. ("RPSA") is a French corporation engaged in the chemical, pharmaceutical, agricultural, and fiber industries.

5. Prior to its merger with a subsidiary of RPSA, Rorer common stock was traded on the New York Stock Exchange, a national securities exchange. Standardized call options contracts of Rorer common stock were traded on the American Stock Exchange.

6. Beginning in July of 1989 and continuing in the Fall of 1989, representatives of Rorer and RPSA conducted a series of confidential discussions aimed at a potential combination between Rorer's and RPSA's pharmaceutical businesses. In August 1989, Rorer and RPSA signed a confidentiality agreement relating to these merger discussions.

7. In October 1989, Rorer and RPSA jointly retained McKinsey & Co., a business consulting firm, to assist the two companies in compiling business forecasts, estimating potential cost savings resulting from a combination of Rorer and RPSA, outlining organization, governance and operational issues, and planning the details of a combination. By November 15, 1989, Rorer and RPSA had exchanged confidential information relating to business plans and projections, and had each retained investment bankers and lawyers for advice relative to the merger under contemplation.

8. The senior managers of Rorer kept knowledge of the merger discussions confidential by restricting knowledge of the discussions to a select few persons on the Rorer corporate staff and by other means, such as using code words to refer to the two companies in planning documents.

9. On January 15, 1990, Rorer publicly announced that it was in discussions regarding a business combination with an unnamed third party, providing for the contemplated acquisition of 68 percent of the outstanding stock of Rorer for a price of $73 per share. Following this announcement, the price of Rorer common stock on the New York Stock Exchange rose by 13¼ points, from $49¾ to $63 per share.

10. On January 18, 1990, Rorer announced that the identity of the third party was RPSA. On March 12, 1990 the tender offer terms were announced. The Rorer and RPSA merger was consummated in July 1990.

11. Witness Ralph ("Randy") Thurman was President of Rorer Pharmaceuticals in the Fall of 1989, reporting directly to Rorer's Chief Executive Officer, Robert Cawthorn. As one of the top officers of Rorer, Mr. Thurman was involved in the discussions with RPSA almost from their inception.

12. Mr. Thurman testified that while the discussions with RPSA were proceeding during the fall of 1989, Rorer CEO Cawthorn and Rorer's head of human resources, Steven Baumgartner, asked Mr. Thurman for his suggestion on who could work on Mr. Cawthorn's employment contract related to the combination with RPSA. He responded that he knew David Meredith, who had an outstanding reputation in the field of CEO level employment contracts, and the person he knew best at Mr. Meredith's firm, Personnel Corporation of America ("PCA"), was Dr. Edmund Piccolino. Dr. Piccolino and Mr. Thurman knew each other from their prior employment at Pepsi–Cola where Mr. Thurman had been Dr. Piccolino's subordinate.

13. In 1989 and 1990, PCA was a human resources consulting firm located in Norwalk, Connecticut and offered a broad range of human resources consulting services in such fields as compensation, benefits, and executive searches.

14. In 1989, Dr. Piccolino was an employee and partner of PCA, and was responsible for executive search and outplacement and client development. He was PCA's "Director of Client Relations" for the Rorer account.

15. Prior to the fall of 1989, PCA had performed search assignments and compensation consulting work for Rorer. PCA had also attempted to secure consulting work from Rorer on other occasions.

16. Mr. Thurman testified he contacted Dr. Piccolino and told him "that circumstances were such that Dave Meredith might be retained to help negotiate on Mr. Cawthorn's behalf or construct on Mr. Cawthorn's behalf an employment agreement related to a pending business transaction that we were contemplating." Mr. Thurman said he was "certain that the framework in which I would have put the need to engage Mr. Meredith would have described the pending transaction between the two companies without— with giving him as little specifics as possible." Mr. Thurman also said he would have, "put it [the information given to Dr. Piccolino] in the context of why Mr. Cawthorn needed the work done and the importance of it and the sense of urgency related to it."

17. Mr. Thurman never asked Dr. Piccolino to keep any information which he may have imparted to him confidential. However, Mr. Thurman testified that he "absolutely" expected Dr. Piccolino to keep confidential the information that he had given him. Dr. Piccolino testified that while PCA client information was treated with confidentiality, the context of the information imparted by Mr. Thurman "was not packaged as a confidential dialogue."

18. In 1989, PCA had an unwritten policy that the confidentiality of information provided to PCA by clients was important and was to be preserved.

19. Dr. Piccolino personally knew defendant Mayhew, and was formerly a neighbor of his in Darien. During 1989 Dr. Piccolino and defendant Mayhew would see each other several times per week, usually on exercise walks. On these walks, as well as on the telephone, Dr. Piccolino and defendant Mayhew would discuss, among other things, trading securities. Dr. Piccolino asked Defendant Mayhew for advice on investment strategy and the mechanics of options trading. Defendant Mayhew knew that Dr. Piccolino was employed at PCA and that PCA was a consulting firm that had various corporations as clients.

20. In the summer and fall of 1989, Dr. Piccolino and defendant Mayhew discussed drug company stocks, recent mergers in the drug industry, and Rorer specifically. At this time defendant Mayhew had formulated a theory that Rorer was a potential merger candidate. Defendant Mayhew advised Dr. Piccolino that he had read several press reports which discussed Rorer as a potential takeover candidate.

21. As evidenced by Dr. Piccolino's PCA time sheets, which were prepared contemporaneously, Dr. Piccolino and Mr. Thurman had lunch together in New York City on November 15, 1989. On his PCA time sheets Dr. Piccolino assigned the meeting an "X800" code, which referred to a potential outplacement client, but the code is not specific as to whether the outplacement refers to as few as one executive or to the many persons who would need outplacement advice in a large scale corporate reorganization.

22. Dr. Piccolino viewed the lunch with Mr. Thurman as having business potential but characterized it as a "lunch with a friend at his request." In contrast to Mr. Thurman's testimony, Dr. Piccolino testified that his lunch conversation with Mr. Thurman focused on Mr. Thurman's personal employment security in a time of organizational change at Rorer.

23. Dr. Piccolino testified that Mr. Thurman told him at this November 15, 1989 lunch that Rorer was definitely involved in serious talks with a potential suitor or merger candidate or candidates. Dr. Piccolino testified he had a specific recollection that Mr. Thurman told him that Rorer "was being

pursued and was in fact discussing merger opportunities," and that Mr. Thurman wanted to know: "how do you know if you can trust someone if you are getting into a complex merger negotiation."

24. Although Dr. Piccolino was not given specific information concerning any pending deal, he testified that he walked away from the Thurman lunch with knowledge that there was "actually activity," that Rorer was "actually in discussions," whereas before the lunch he had only known of speculation about Rorer in the press.

25. Dr. Piccolino then told defendant Mayhew about his lunch with Thurman, identifying who Thurman was to defendant, and telling him that the substance of the lunch conversation confirmed that Mayhew's theory about Rorer as a takeover candidate was indeed correct.

26. While Dr. Piccolino recalls discussing the Thurman lunch with Mayhew, he did not recall when such discussions occurred. He testified, however, that he would not have purchased Rorer stock options on November 16, 1989 without first speaking to defendant Mayhew.

27. Between November 16, 1989, and January 15, 1990, Dr. Piccolino made stock and option trades in Rorer securities, resulting in a profit of $20,449.60.

28. Dr. Piccolino was sued by the Securities and Exchange Commission for insider trading relative to this trading in the securities of Rorer. Dr. Piccolino settled the suit by repaying the profit he made on the sale of the options and the common stock and by paying a penalty equal to one times that gain. Dr. Piccolino did not agree to testify against defendant Mayhew as part of that settlement, and testified under subpoena from both parties.

29. Defendant Jonathan Mayhew denied recalling that Dr. Piccolino had discussed with him the November 15, 1989 Thurman lunch and conversation about Rorer.

30. However, starting on November 16, 1989 (the day following the Thurman lunch), to January 15, 1990 (the day of the first public announcement confirming Rorer's actual merger discussions), defendant Mayhew made the following trades in Rorer common stock and call options:

| Date | B/S | Number Shares/Contracts | | Price | Dollar Amount |
|------|-----|-------------------------|---|-------|---------------|
| 11/16/89 | Buy | 5,000 common stock | @ | 43 1/4 | − $217,228.23 |
| 11/17/89 | Buy | 2,500 common stock | @ | 43 | − $108,051.73 |
| 01/15/90 | Sell | 7,500 common stock | @ | 60 1/4 | + $449,956.28 |
| profit (loss) | | | | | 124,676.32 |
| | | | | | |
| 11/16/89 | Buy | 50 Dec 45 call options | @ | 3/4 | − $3,966.68 |
| 12/05/89 | Sell | 50 Dec 45 call options | @ | 9/16 | + $2,649.89 |
| profit (loss) | | | | | (1,316.79) |
| | | | | | |
| 12/01/89 | Buy | 50 Jan 45 call options | @ | 1 1/4 | − $6,492.30 |
| 12/19/89 | Buy | 50 Jan 45 call options | @ | 7/8 | − $4,594.08 |
| 12/26/89 | Sell | 25 Jan 45 call options | @ | 1 7/8 | + $4,492.21 |
| 12/28/89 | Sell | 75 Jan 45 call options | @ | 1 7/8 | + $13,542.92 |
| profit (loss) | | | | | 6,948.75 |
| | | | | | |
| 12/27/89 | Buy | 100 Feb 50 call options | @ | 1 1/16 | − $11,211.80 |
| 01/15/90 | Sell | 100 Feb 50 call options | @ | 11 1/8 | + $110,434.78 |
| profit (loss) | | | | | 99,222.98 |
| | | | | | |
| 01/08/90 | Buy | 2,000 common stock | @ | 47 5/8 | − $95,712.00 |
| 01/15/90 | Sell | 2,000 common stock | @ | 60 1/2 | + $120,433.96 |
| profit (loss) | | | | | 24,701.96 |
| | | | | | |
| Total Profit: | | | | | $255,550.01 |

31. Two months later, on January 15, 1990, after the public announcement by Rorer, defendant Mayhew sold 9500 shares of the common stock and 100 call options he had accumulated since November 16, 1989, making a profit of $255,550.01.

32. In placing his purchase and sale orders for Rorer stock and options, defendant Mayhew made use of the telephone.

33. Defendant Mayhew received written confirmations of his Rorer purchase and sale orders and account statements describing his Rorer purchase and sale orders through the United States mails. Apart from his Rorer profit, defendant otherwise lost $166,821 between August 1989 and January 1990, and ceased his trading in 1991 altogether because he lost too much money.

34. As of January 9, 1990, Defendant Mayhew's investments in Rorer securities were worth approximately $430,000. This was almost three-quarters of his then net financial worth, and two-thirds of the purchase price had been borrowed.

35. Previous to the Thurman lunch, from September 13, 1989 to November 8, 1989, Defendant Mayhew had traded Rorer stock and options at a cumulative loss of approximately $11,500. By November 8, 1989, Defendant Mayhew had completely liquidated his position in Rorer.

36. Defendant Mayhew testified that he made his decision to purchase Rorer securities on November 16 and 17, 1989 and in the weeks following, relying in part upon brokerage house research reports and media reports which cited Rorer (among many companies) as a potential takeover candidate.

37. However, the research and media reports that defendant claims to have relied on were all dated August 24, 1989 and earlier, almost three months before November 16, 1989 when he began his very substantial purchases of Rorer securities and call options.

38. Defendant Mayhew further justified that his decision to engage in these extensive purchases on November 16 and 17, 1989 and following was based on brokerage house research reports he received from Smith Barney dated October 18, 1989, November 20, 1989, and January 2, 1990. These reports focused on the pharmaceutical industry, and identified certain companies as potential takeover candidates. Significantly, however, Rorer was not included in these lists.

39. Defendant Mayhew also testified that he purchased 7500 Rorer shares and 50 call options on November 16 and 17, 1989, in part because of "tape activity," meaning price and volume activity in the market for Rorer stock. However, the evidence at trial showed no significant price activity in Rorer common stock on or around November 16, 1989 to explain defendant Mayhew's major re-entry into the Rorer market he had just recently exited. The closing price for Rorer common stock on November 16, 1989, was $42⅞, less than what Rorer had traded for in September and October 1989, and the price trend in Rorer common stock was downward in the week immediately preceding November 16, 1989. In the week prior to November 16, 1989, the price for Rorer common stock per share closed as follows: November 9, 1989, Rorer closed at $43⅞, down $⅝ from that day's high price of $44½; November 10, 1989, closed at $43⅞, unchanged from previous day's close; November 13, 1989, closed at $43½, down $⅜; November 14, 1989, closed at $43, down $½; and November 15, 1989, closed at $42⅞, down $⅛.

## III. Conclusions of Law and Discussion

1. The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

2. Under the traditional theory of insider trading, liability may be imposed under Rule 10b–5 on a corporate insider "who discloses material, nonpublic information to an outsider in breach of his fiduciary duty to the corporation's shareholders." *SEC v. Downe,* 92 Civ. 4092, 1993 WL 22126 (S.D.N.Y. January 26, 1993) (citing *Chiarella v. United States,* 445 U.S. 222, 227–235, 100 S.Ct. 1108, 1114–1118, 63 L.Ed.2d 348 (1980)).

3. The Second Circuit has adopted a second theory of liability. Under the "misap-

propriation theory," "a person violates Rule 10b–5 when he misappropriates material non-public information in breach of a fiduciary duty or similar trust and confidence and uses that information in a securities transaction." *United States v. Chestman,* 947 F.2d 551, 566 (2d Cir.1991), *cert. denied,* 503 U.S. 1004, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992). The phrase "similar relationship of trust or confidence" has been interpreted as the "functional equivalent of a fiduciary relationship," *Id.* at 568.

■ 4. The Second Circuit has held that a "fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information." *Id.* at 567 (citing *Walton v. Morgan Stanley & Co.,* 623 F.2d 796, 799 (2d Cir.1980). One acts in a "fiduciary capacity" when:

> the business which he transacts, or the money or the property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other.

*Id.* at 568–69 (citing *Black's Law Dictionary* 564 (5th ed. 1979).

■ 5. In order to sustain liability under either theory, the SEC must show that the defendant acted with scienter. *See Aaron v. SEC,* 446 U.S. 680, 701–702, 100 S.Ct. 1945, 1958–1959, 64 L.Ed.2d 611 (1980). In addition, the SEC must establish that the non-public information was material in that there was " 'substantial likelihood' that a 'reasonable investor' would have considered the omitted information significant at the time." *Basic v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983–84, 99 L.Ed.2d 194 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)).

■ 6. The evidence of the nature of Piccolino's relationship with Thurman for the purposes of the lunch meeting is equivocal. On balance the SEC's proof falls short of establishing that Dr. Piccolino was the functional equivalent of a fiduciary of Rorer or Thurman. Dr. Piccolino testified that his lunch conversation with Mr. Thurman, while having business potential, arose out of their prior professional, "mentoring" and personal relationship. Moreover, there was never any formal agreement before or after the lunch between PCA and Rorer regarding outplacement services for either Mr. Thurman or Mr. Cawthorn. At trial, Dr. Piccolino responded to the question about whether he viewed his lunch with Mr. Thurman as a client transaction as follows:

> If you mean that was it a consulting assignment billable or even likely to be billable, I would say no. I viewed it as a lunch with a friend at his request. The only modification I would make to that, it clearly was the kind of a dialogue that had potential to lead to further consulting work.

(Tr. 537.)

Determining whether this multifaceted relationship gives rise to the existence of a fiduciary relationship is aided by the Second Circuit's analysis in *Walton v. Morgan Stanley & Co., supra.* In *Walton,* Morgan Stanley, an investment bank, retained by Kennecott Copper to find a company to acquire, obtained unpublished internal earnings reports on a confidential basis from a willing prospective takeover company, Olinkraft. After Kennecott abandoned its plans to take over Olinkraft, another company announced an offer for it. Morgan Stanley bought Olinkraft stock and then disclosed Olinkraft's confidential information to Johns Mansville to induce it to improve on the other offeror's bid, which it did thereby increasing the value of Morgan Stanley's holdings in Olinkraft.

Upholding dismissal of a stockholder action demanding that Olinkraft's directors commence proceedings to require Morgan Stanley to account for its profits from its purchase of Olinkraft, the Second Circuit found that Morgan Stanley stood in no fiduciary relationship to Olinkraft, despite receiving its financial information on a strictly confidential, limited use basis, because it was never hired on Olinkraft's behalf, and concluded that the two were each responsible to different interests and were presumed to have dealt at arm's length:

[T]he fact that the information was confidential did nothing, in and of itself, to change the relationship between Morgan Stanley and Olinkraft's management. Put bluntly, although, according to the complaint, Olinkraft's management placed its confidence not to disclose the information, Morgan Stanley owed no duty to observe that confidence.

*Walton,* 623 F.2d at 799. *See also Dirks v. Securities and Exchange Commission,* 463 U.S. at 662 n. 22 (1983) (citing *Walton* approvingly as a "case turning on the court's determination that the disclosure did not impose any fiduciary duties on the recipient of the inside information."); *Chestman,* 947 F.2d at 568 ("Reposing confidential information in another, then, does not itself create a fiduciary duty.").

In contrast to the "corporate marriage-broker" conduct which was found to not constitute a fiduciary role, which troubled dissenting Judge Oakes in *Walton* because of the role of investment bankers during merger and acquisition activity, Piccolino's ambiguous and ambivalent role at the time of the lunch when he obtained the insider information was much more akin to the proverbial "old boy networking," not the functional equivalent of a fiduciary relationship, lacking indicia of de facto control and dominance resulting from the confidence reposed. *United States v. Chestman,* 947 F.2d 551, 568 (2d Cir.1990).

The fact that Mr. Thurman expected Dr. Piccolino to keep the substance of the lunch conversation confidential did not, in itself, give rise to a fiduciary duty, and Dr. Piccolino himself was ambiguous about his own duty of confidentiality at that point. Without any formal agreement establishing a relationship at that time between Rorer and PCA, or Mr. Thurman and PCA, Dr. Piccolino has not been shown to have owed a fiduciary duty to Mr. Thurman or PCA.

Because plaintiff has not proved a fiduciary-type relationship between Dr. Piccolino and Rorer, Defendant consequently could not be "derivatively liable" as Piccolino's tippee under Rule 10b–5. *See Chestman,* 947 F.2d at 571.

7. Defendant is also charged with violating section 14(e) of the Act and Rule 14e–3(a) which provides:

If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the "offering person"), it shall constitute a fraudulent, deceptive, or manipulative act or practice within the meaning of section 14(e) of the Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from:  ... (3) Any officer, director, partner, or employee, or any other person acting on behalf of the offering person or such issuer, to purchase or sell or cause to be purchased or sold any of such securities or any securities convertible into or exchangeable for any such securities, unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise.

17 C.F.R. § 240.14e–3(a) (1989).

8. Rule 14e–3(a) makes it illegal for anyone who "trades on the basis of material nonpublic information concerning a pending tender offer that he knows or has reason to know has been acquired 'directly or indirectly' from an insider of the offeror or issuer, or someone working on their behalf." *Chestman,* 947 F.2d at 557 (*citing* 17 C.F.R. § 240.14e–3(a)). For the SEC to prove this element of its claim, it must show that Defendant Mayhew has knowingly misused material, non-public information. *Schreiber v. Burlington Northern,* 472 U.S. 1, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985).

■ 9. The Court finds that the record of RSPA and Rorer joint activities before November 16, 1989, demonstrates that RPSA had taken substantial steps towards the commencement of its tender offer for the securities of Rorer. *SEC v. Maio,* 51 F.3d 623, 636–637 (7th Cir.1995).

10. The Court finds that Mr. Mayhew did learn the insider origin and substance of Mr. Thurman's information regarding actual, ongoing activity towards a Rorer takeover and

that the material, nonpublic, insider character of this information motivated his purchases of 7500 shares in Rorer within in a forty-eight hour period. The Court further finds that Defendant's continued investments in Rorer shares and call options until the merger negotiation information became public by Rorer's January 15, 1990 announcement, when defendant sold all his holding and reaped a $255,550 profit, were influenced by the information learned from the Thurman lunch, not just publicly disseminated research reports, tape activity or analysts' articles.

The determination whether Piccolino imparted to Mayhew his insider Rorer information requires a credibility determination by the court. While the Court recognizes the divergence of testimony between Dr. Piccolino and Mr. Mayhew as to whether defendant received this insider information from Dr. Piccolino following the Thurman lunch on November 15, 1989, weighing the evidence at trial, the Court finds Dr. Piccolino's version of the events far more credible. Given the Rorer stock purchases by defendant (and Dr. Piccolino) immediately after the Thurman lunch in an amount constituting 50% of defendant's net worth, which continued without other justifying events until Rorer represented 75% of Defendant's stock holdings, the Court concludes that Mr. Mayhew did learn from Dr. Piccolino the substance of the Thurman insider information—that Rorer was in serious merger discussions—on either November 15 or 16, 1989, and in response immediately and continually increased his position in Rorer until he was in a position to reap the gains upon the subsequent Rorer public announcement of what Mayhew already knew.

The Court rejects the possibility that it was sheer coincidence that in the next two days following the Thurman lunch, Defendant Mayhew invested approximately $329,-246.64 in Rorer stock and options after he had totally liquidated his position in Rorer on November 8, 1989 at a loss. Defendant's attempted justification of why he purchased on those particular dates, and in those amounts, is simply unpersuasive.

11. The Court finds that the information confirming the existence of these serious negotiations that was passed by Mr. Thurman through Dr. Piccolino to Defendant Mayhew was nonpublic, material information, not as defendant urges, information constituting nothing more than the takeover theories being bandied around in the marketplace. Mr. Thurman's information constituted an insider's confirmation that the rumors—that Rorer was in serious discussion regarding merger—circulating in the media were in fact true, a fact that when announced on January 15, 1990 immediately drove its share price up more than 13 points.

█ It is of no consequence in determining materiality that Dr. Piccolino did not learn specific details concerning any pending deal, such as whether Rorer would be the acquirer or the acquiree in any possible transaction the type of transaction that would occur, the price of any transaction, when any such transaction might occur, or how many companies were having discussions with Rorer. Information is material if there is a substantial likelihood that a reasonable investor would have regarded this nonpublic information regarding Rorer as important to his or her investment decision. *Basic, Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988).

The evidence in this case confirms that this information was material and important to a reasonable investor's investment decision. *See SEC v. Shapiro,* 494 F.2d 1301, 1307 (2d Cir.1974). The fact that the defendant, who admitted to being a sophisticated investor, purchased substantial amounts and stock and options in Rorer immediately after learning this information, "demonstrates empirically that the information was material." *Id.* See *SEC v. Geon Industries, Inc.,* 531 F.2d 39, 47 (2d Cir.1976) (citing *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1968), *cert. denied* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)) ("[N]ot only the probability of an event but also the magnitude of its potential impact on a company's fortunes are relevant to the determination of materiality of inside information."); *SEC v. Materia,* 745 F.2d·197, 199, (2d Cir.1984) *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477

(1985). ("[E]ven a hint of an upcoming tender offer may send the price of the target company's stock soaring."). Moreover, the eventual public announcement in January 1990 that Rorer was in fact in serious merger discussions with an unnamed suitor drove the stock price up immediately in testament to the materiality of the Thurman information.

12. The Court finds that defendant had reason to know that Dr. Piccolino's information about Rorer had come from a Rorer insider, i.e., highly-placed Thurman, a Rorer senior executive.

13. Accordingly, Jonathan Mayhew is found to have violated Section 14(e) and Rule 14e–3.

## IV. Conclusion

1. The Court finds for the Defendant Mayhew on Count One (trading in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78(b)) and Rule 10b–5, 17 C.F.R. § 240.10b–5.

2. The Court finds for the Plaintiff SEC on Count Two (trading in violation of Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), Rule 14e–3, 17 C.F.R. § 240.14e–3).

3. The Court orders that Defendant Mayhew disgorge his wrongful gains of $255,-550.01 from trading in Rorer securities between November 16, 1989, and January 15, 1990 in violation of Section 14(e) of the Exchange Act and Rule 14(e)–3 thereunder. *SEC v. Materia,* 745 F.2d 197 (2d Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985). This amount shall not be reduced by the losses incurred by defendant Mayhew in trading Rorer securities during the period November 16, 1989, through January 15, 1990 inclusive. *SEC v. Shapiro,* 494 F.2d 1301, 1309 (2d Cir.1974).

4. Defendant Mayhew is further ordered to pay prejudgment interest on his wrongful gains on trading in the securities of Rorer up to date of entry of judgment. *Rolf v. Blyth, Eastman Dillon & Co.,* 637 F.2d 77, 86 (2d Cir.1980); *Norte & Co. v. Huffines,* 416 F.2d 1189, 1191 (2d Cir.1969), *cert. denied,* 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970). The amount of interest owed through September 30, 1995 is $160,031.58 based on the rate used by the IRS for the underpayment of taxes. (See Plaintiff's Attachment "A".) The additional interest owed from October 1, 1995 through the date of judgment is to be similarly calculated. This deprives defendant Mayhew of the unjust enrichment he has received by having retained his wrongful profits until now. *See SEC v. Drexel Burnham Lambert Inc.,* 837 F.Supp. 587, 612 (S.D.N.Y.1993), *aff'd sub nom, SEC v. Posner,* 16 F.3d 520 (2d Cir. 1994), *cert. denied,* — U.S. —, 115 S.Ct. 724, 130 L.Ed.2d 629 (1995).

5. Notwithstanding defendant's testimony that he is no longer engaged in securities trading professionally, given his potential for future social corporate contacts and given the relative flagrance of defendant's use of insider information in this case, and his denials, injunctive relief to prohibit similar use of future opportunities appears appropriate.

6. Defendant Jonathan Mayhew and his agents, servants, employees and attorneys and those persons in active concert or participation with him who receive actual notice thereof, are ordered permanently restrained and enjoined from violating, directly or indirectly, Section 14(e) of the Exchange Act (15 U.S.C. § 78n(e)) and Rule 14e–3 promulgated thereunder (17 C.F.R. § 240.14e–3), in connection with any tender offer, or a request or invitation for tenders, by engaging in any fraudulent, deceptive, or manipulative acts or practices by:

(1) purchasing or selling or causing to be purchased or sold the securities sought or to be sought by such tender offer, or any security convertible into or exchangeable for any such security or any option or right to obtain or dispose of the foregoing securities, while in possession of material information relating to said tender offer which information they know or have reason to know was acquired directly or indirectly from:

(i) a person who has taken a substantial step or steps to commence such a tender offer ("the offering person"),

(ii) the issuer of the securities sought or to be sought by such tender offer, or

(iii) any officer, director, partner, employee or other person acting on behalf

of the offering person or such issuer, unless

(a) within a reasonable time prior to any such purchase or sale such information and its source are publicly disclosed; or

(b) they purchase any such security while acting in the capacity of a broker or agent on behalf of the offering person; or

(c) they sell any such security to the offering person; or

(2) communicating material nonpublic information relating to such a tender offer, which information they know or have reason to know was acquired directly or indirectly from

(i) the offering person,

(ii) the issuer of the securities sought or to be sought in a such a tender offer, or

(iii) any person acting on behalf of the offering person or on behalf of such issuer, to any other person under circumstances in which it is reasonably foreseeable that such communication is likely to result in the purchase or sale of securities *provided however,* that this Paragraph shall not apply to communications made in good faith to

(a) the officers, directors, partners or employees of the offering person, to its advisors or to other persons, involved in the planning, financing, preparation or execution of such tender offer;

(b) the issuer whose securities are sought or to be sought by such tender offer, to its officers, directors, partners, employees or advisors or to other persons, involved in the planing, financing, preparation or execution of the activities of the issuer with respect to such tender offer; or

(c) any person pursuant to a requirement of any status or rule or regulation promulgated thereunder.

Judgment shall enter in accordance with this opinion.