**SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee–Cross–Appellant,**

v.

**Jonathan MAYHEW, Defendant–Appellant–Cross–Appellee.**

**Nos. 220, 221, Dockets 96–6022,96–6092.**

United States Court of Appeals, Second Circuit.

Argued Sept. 25, 1996.

Decided July 29, 1997.

Victor L. Zimmermann, Jr., New Canaan, CT (Edward V. O'Hanlan, Elizabeth T. Grove, O'Rourke O'Hanlan & Zimmermann, New Canaan, CT, on the brief), for Defendant–Appellant–Cross–Appellee.

Susan Ferris Wyderko, Senior Litigation Counsel, Securities and Exchange Commission, Washington, DC (Paul Gonson, Solicitor, of counsel, Richard H. Walker, General Counsel, Jacob H. Stillman, Associate General Counsel, Washington, DC, on the brief), for Plaintiff–Appellee–Cross–Appellant.

Before: WALKER, JACOBS, Circuit Judges, and CARMAN, Judge.[*]

WALKER, Circuit Judge:

Jonathan Mayhew appeals from a final judgment of the United States District Court for the District of Connecticut (Janet Bond Arterton, *District Judge*) holding him liable, in a civil enforcement proceeding, for violating § 14(e) of the Securities and Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78n(e), and Rule 14e–3, 17 C.F.R. § 240.14e–3, promulgated thereunder. *SEC v. Mayhew*, 916 F.Supp. 123 (D.Conn.1995).

The issue raised by this appeal is whether a person, who does not have a fiduciary duty to a corporation, is liable under § 14(e) and Rule 14e–3 when he trades in the corporation's securities based on information disclosed to him indirectly by a corporate insider to the effect that a merger is imminent and probable by confirming rumors, widely circulated in the financial press, that the corporation is engaged in serious negotiations with one or more merger candidates. On appeal, Mayhew contends the district court erred in finding him liable for insider trading that violates § 14(e), claiming that the information which he received was neither nonpublic and material nor "in connection with" a tender offer. In its cross-appeal, the Securities and Exchange Commission (the "Commission") contends that the district court erred by overlooking its prayer for an assessment of civil penalties under the Insider Trading Sanctions Act ("ITSA"), 15 U.S.C. § 78u–1(a). We reject each contention and affirm the district court in all respects.

---

[*] The Honorable Gregory W. Carman of the United States Court of International Trade, sitting by designation, became Chief Judge after oral argument.

## BACKGROUND

In 1988, defendant Jonathan Mayhew, formerly a corporate pilot, turned to securities trading as a full-time occupation. His strategy was to invest in the stock of companies he believed to be takeover candidates. In 1989, Mayhew and his Darien, Connecticut neighbor, Dr. Edmund Piccolino, saw each other two or three times a week, typically on exercise walks. On these walks, Mayhew and Piccolino, whom Mayhew knew to be a partner at the consulting firm of Personnel Corporation of America ("PCA"), often discussed securities investment strategies. One such discussion, sometime after November 15, 1989, led to this enforcement action by the Commission.

From July 1989 through January 1990, representatives of Rorer Group, Inc. ("Rorer") and Rhone–Poulenc S.A. ("RPSA") held a series of confidential discussions which culminated in RPSA's tender offer for Rorer's pharmaceuticals business. To preserve the confidentiality of these discussions, Rorer and RPSA signed a confidentiality agreement in August 1989, restricted knowledge of the impending tender offer to a few executives, and used code words to refer to the two companies in documents relating to the merger. In October 1989, Rorer and RPSA retained McKinsey & Company, Inc., a management consulting firm, to assist in compiling and presenting financial projections for each company separately and to help construct a joint strategy for the combination.

In early November 1989, Ralph Thurman, president of Rorer's pharmaceuticals business, and other top Rorer executives met in Paris, France, with representatives of RPSA and consultants from McKinsey to discuss the structure of the contemplated merger and present business projections for Rorer's pharmaceuticals business. After this meeting, Thurman believed that the merger was "highly likely" to proceed.

During the course of the negotiations, Robert Cawthorn, Rorer's Chief Executive Officer ("CEO"), asked Thurman to recommend a consultant to work on Cawthorn's employment contract in light of the anticipated combination with RPSA. Thurman suggested Piccolino, who previously had been a consultant for Rorer and with whom Thurman had a prior independent business relationship.

On November 15, upon his return from Paris, Thurman met with Piccolino to discuss the possibility of PCA negotiating Cawthorn's employment agreement in connection with a "pending business transaction," which he described, "giving [Piccolino] as little specifics as [he] needed to" explain to Piccolino why Cawthorn needed the work done. Thurman testified at trial that he "absolutely" expected Piccolino to keep the information confidential.

Piccolino testified that, during this meeting, Thurman revealed that Rorer "was being pursued and/or was actively pursuing companies to merge or integrate or acquire" and that "the company had been approached and was discussing alternatives as an active ongoing part of their life. [Thurman] was pretty circumspect about it, but, nonetheless, you got the impression that activity was under way." Thurman wanted to know "how do you know if you can trust someone when you are getting into a complex merger negotiation." Piccolino also testified as follows:

Q: But, nevertheless, it was Randy Thurm[an] who told you at the lunch that they are definitely involved in serious talks with a potential suitor or merger candidate.

A: Absolutely.

. . .

Q: We left the realm, as it was reported in magazine articles elsewhere, of a speculative nature of Rorer being one of the Potential [sic] candidates, plural, and moving into the area of [a] senior officer of Rorer saying to you we are in serious talks with a potential merger candidate or candidates?

A: Yes.

Piccolino concluded: "I walked away from that meeting with the knowledge that there was actually activity—they were actually in discussions with somebody or many players. . . ."

Prior to November 15, 1989, the financial press had periodically published articles sug-

gesting that Rorer might be a takeover candidate. During the summer of 1989, Mayhew "speculated [with Piccolino] on more than one occasion that Rorer was a company that was ripe to be acquired or merged with another company." In September 1989, Mayhew began to trade in Rorer securities. But his Rorer trading ended on November 8, 1989, when Mayhew sold the last of his Rorer securities, sustaining a loss on all his Rorer trades of $11,500.

Following his November 15, 1989 meeting with Thurman, Piccolino "relayed the essence of that conversation [with Thurman]" to Mayhew and specifically "identif[ied] Randy Thurm[an] to Mayhew." He told Mayhew that Thurman, a Rorer insider, had confirmed Mayhew's theory that Rorer was ripe to be acquired and that Rorer was actively pursuing a partner. Mayhew has consistently denied any recollection of this conversation.

Piccolino testified that, after disclosing to Mayhew the information he had obtained from Thurman, he asked Mayhew to advise him on an appropriate investment strategy. Following this discussion, although he had never before purchased Rorer securities and was personally unfamiliar with option trading, Piccolino bought 25 call options in Rorer stock on November 16, 1989.

Also on November 16, 1989, eight days after liquidating his entire position in Rorer at a loss, Mayhew began to switch most of his investment portfolio, then valued at about $600,000, back into Rorer securities. By January 9, 1990, Mayhew had amassed more than $430,000 in Rorer stocks and options.

Mayhew testified that these purchases were motivated by the information he gathered from publicly disseminated articles and from closely following Rorer stock activity. Mayhew claimed that his November purchases were motivated by an "upside volume" in Rorer securities; however, market records show that both the price and the daily volume of Rorer shares traded fell during November.

On January 15, 1990, Rorer publicly announced that it was discussing a contemplated tender offer with an unnamed third party and disclosed the terms of the proposed combination. That same day, following the announcement, the price of Rorer stock rose from $49.75 to $63 per share, and the following day Mayhew sold his accumulated Rorer securities for a profit of $255,550.01.

On August 9, 1994, the Commission filed a civil enforcement proceeding against Mayhew claiming that his trades in Rorer securities between November 16, 1989 and January 15, 1990 violated §§ 10(b) and 14(e) of the 1934 Act, 15 U.S.C. §§ 78j(b) & 78n(e), and Rules 10b–5 and 14e–3, 17 C.F.R. §§ 240.10b–5 & 240.14e–3, promulgated thereunder. After a bench trial, the district court found that Mayhew's trades in Rorer securities during that period violated § 14(e) and Rule 14e–3, but not § 10(b) or Rule 10b–5. The district court ordered Mayhew to disgorge his wrongful gains of $255,550.01 from trading in Rorer securities between November 16, 1989 and January 15, 1990, plus prejudgment interest. The district court also entered a permanent injunction against Mayhew, but did not order sanctions under the ITSA.

## DISCUSSION

The Supreme Court, in *United States v. O'Hagan*, — U.S. —, —–—, 117 S.Ct. 2199, 2216–19, 138 L.Ed.2d 724 (1997), faced with a claim that Rule 14e–3 exceeded the Commission's authority under § 14(e) of the 1934 Act, recently upheld the validity of Rule 14e–3 which imposes liability on persons who trade on material, nonpublic information in connection with a tender offer without regard to whether the trader owes a fiduciary duty to respect the confidentiality of the information. *See also United States v. Chestman*, 947 F.2d 551, 557 (2d Cir.1991) (*in banc*), *cert. denied*, 503 U.S. 1004, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992).

On appeal, Mayhew does not question the rule-making authority of the Commission in promulgating Rule 14e–3; instead, he challenges the sufficiency of the evidence in support of the district court's finding of Rule 14e–3 liability. He claims that any information he received from Piccolino was already public when he obtained it; that even if the information was nonpublic, it lacked the requisite detail to be material; and finally, that

the information was not "in connection with" a tender offer because the projected tender offer did not occur until two months after Mayhew's receipt of the information. The Commission cross-appeals, claiming that the district court erred when it overlooked the Commission's claim for civil penalties under the ITSA.

## I. *Sufficiency of the Evidence*

Turning first to Mayhew's sufficiency of the evidence arguments, we note that the district court's factual findings on that score must be upheld unless clearly erroneous. *SEC v. Posner*, 16 F.3d 520, 521 (2d Cir.1994), *cert. denied*, 513 U.S. 1077, 115 S.Ct. 724, 130 L.Ed.2d 629 (1995). The district court's determination of the applicable legal principles is reviewed *de novo*. *United States v. Russo*, 74 F.3d 1383, 1389 (2d Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 293, 136 L.Ed.2d 213 (1996).

## A. *Nonpublic Information Requirement*

Citing articles in the financial press and the fluctuations in the price of Rorer shares prior to his November 1989 conversation with Piccolino, Mayhew argues that the information he received from Piccolino was already public, relieving him of liability.

Of course, trading based on public information does not violate § 14(e). *See United States v. Libera*, 989 F.2d 596, 601 (2d Cir.1993). Information becomes public when disclosed "to achieve a broad dissemination to the investing public generally and without favoring any special person or group," *Dirks v. SEC*, 463 U.S. 646, 653 n. 12, 103 S.Ct. 3255, 3261 n. 12, 77 L.Ed.2d 911 (1983) (citing *In re Faberge, Inc.*, 45 S.E.C. 249, 256 (1973)), or when, although known only by a few persons, their trading on it "has caused the information to be fully impounded into the price of the particular stock," *Libera*, 989 F.2d at 601. Moreover, "[t]o constitute non-public information under the act, information must be specific and more private than general rumor." *United States v. Mylett*, 97 F.3d 663, 666 (2d Cir. 1996), *cert. denied*, — U.S. —, 117 S.Ct. 2509, 138 L.Ed.2d 1013 (1997). On the other hand, information may be nonpublic within the meaning of the 1934 Act even though it does not reveal all the details of a tender offer. *See, e.g., id.* at 666–67.

Mayhew bases his argument on the widespread media speculation, prior to November 15, 1989, that Rorer was a takeover or merger candidate. As early as April 5, 1988, one article predicted that "Rorer itself ha[d] become a takeover candidate" after its stock price dropped following Rorer's failed attempt to acquire another pharmaceutical company. *Heartburn*, Fin. World, Apr. 5, 1988, at 24. On May 30, 1989, another article placed Rorer on a "hit list" of six pharmaceutical companies that it predicted were vulnerable takeover targets. Robert Teitelman, *Pharmaceuticals*, Fin. World, May 30, 1989, at 57. On July 31, 1989, an article discussed the rise in Rorer stock due to "speculation about the next takeover target" in the pharmaceutical industry. Douglas R. Sease, *Upward Mobility: Available Cash May Propel Stocks Even Higher*, Wall St. J., July 31, 1989. In contrast, another article indicated that Rorer planned to stay independent. Janet Novack, *Please Pass the Maalox*, Forbes, Aug. 7, 1989, at 114.

Other articles published before November 15, 1989, reported on the effects of the rumored takeover on Rorer's stock price. An August 21, 1989 article discussed the jump in the price of Rorer stock following a May 1989 announcement by Cawthorn that he was "willing to merge [Rorer] with the 'right partner'" and the subsequent fall in Rorer stock when "the right partner didn't come around." Gene G. Marcial, *Has Rorer Found A Friend?*, Bus. Wk., Aug. 21, 1989, at 88. The article then reported that "takeover pros" predicted that a "partner apparently is in sight" and that two major United States pharmaceutical companies, possibly Upjohn, and a European conglomerate "are whispered to have informally talked with Rorer about a possible merger or outright takeover." *Id.*

In sum, the aggregate of public information prior to November 15, 1989, was to the effect that Rorer was willing to merge if it found the right partner and that Rorer was discussing this possibility with up to three

companies. Privately, Rorer executives took care to keep information about actual merger discussions secret by limiting the persons who knew about specific merger negotiations to top executives and by using codes in related documents.

We agree with the district court that the information Piccolino conveyed to Mayhew went beyond that which had been publicly disseminated. Mayhew learned from Piccolino that Thurman, the president of Rorer's pharmaceuticals business, had confirmed that Rorer was "actually in discussions" toward merger with a candidate or candidates. He also learned that these merger talks were at a "serious" stage—far enough along to warrant PCA's involvement in negotiating a new employment agreement for Rorer's CEO. To a reasonable investor, this combination of new information, acquired privately, transformed the likelihood of a Rorer merger from one that was certainly possible at some future time to one that was highly probable quite soon.

In *Mylett*, we held that a corporate insider's confirmation of information on which the financial press had speculated can satisfy the nonpublic requirement in the context of § 10(b). In that case, the *Wall Street Journal* had reported that AT & T and NCR Corporation were discussing ways to integrate their businesses. On the same day that the article was published, an AT & T insider called Cusimano to confirm the contents of the article and predicted that AT & T would acquire NCR. Cusimano subsequently began trading in NCR securities. 97 F.3d at 665–66. We held that the tip Cusimano received satisfied the nonpublic requirement of § 10(b) because the confirmation by an insider of the merger speculated in the press made it less likely that nothing would happen. *Id.* at 666–67. We see no reason to take a different view under similar circumstances in the context of § 14(e), and thus discern no error in the district court's finding that the information passed from Thurman to Piccolino to Mayhew exceeded that in the financial press and, to that extent, was not public.

■ In the alternative, Mayhew argues that the information he received from Piccoli-

no was public because it was already built into the price of Rorer stock which had risen on speculation of merger and subsequently fallen as rumored mergers did not take place. We agree that the merger rumors in the media, prior to November 15, 1989, had pushed up the price of Rorer shares; however, the fact that, from the investors' perspective, the rumors had not borne fruit was also impounded into the price, causing it to drop. In these circumstances, it was reasonable for the finder of fact to conclude that this new information that (i) serious merger negotiations were actually ongoing, and (ii) had reached the point where the CEO was about to negotiate a new employment contract with the merged entity, had not been impounded into the price of Rorer stock. That conclusion is buttressed by the fact that on January 15, 1989, when the merger discussions were disclosed, the price of Rorer stock rose more than 20 percent from $49.75 to $63 per share.

In sum, we discern no clear error in the district court's finding that the information Mayhew received from Piccolino following the latter's November 15, 1989 luncheon with Thurman, effectively confirming information about which there had been speculation and lending a degree of immediacy to it, was nonpublic. *See Libera,* 989 F.2d at 601.

### B. *Materiality Requirement*

■ Mayhew also challenges the district court's materiality finding, arguing that the information he received from Piccolino lacked sufficient specificity to be material. We disagree.

■ Information is material " 'if there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [invest].' " *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)); *Macfadden Holdings, Inc. v. JB Acquisition Corp.,* 802 F.2d 62, 69 n. 3 (2d Cir.1986). The materiality of information is a mixed question of law and fact. *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1466 (2d Cir.1996), *petition for cert. filed,* 65 U.S.L.W. 3799 (U.S.

May 23, 1997) (No. 96–1862). "The legal component depends on whether the information is relevant to a given question in light of the controlling substantive law. The factual component requires an inference as to whether the information would likely be given weight by a person considering that question." *Id.* at 1466–67 (citations omitted).

To be material, the information need not be such that a reasonable investor would necessarily change his investment decision based on the information, as long as a reasonable investor would have viewed it as significantly altering the "total mix" of information available. *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. at 2132; *Flynn v. Bass Bros. Enters.*, 744 F.2d 978, 985 (3d Cir.1984). Material facts include those "which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968) (*in banc*). They include any fact "which in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities." *Id.* at 849 (quoting *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir.1965)).

In the context of a merger, where information can be speculative and tenuous, the materiality standard may be difficult to apply. *Cf. Basic*, 485 U.S. at 236, 108 S.Ct. at 986. Materiality will, in such cases, depend "upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Id.* at 238, 108 S.Ct. at 987 (quoting *Texas Gulf Sulphur Co.*, 401 F.2d at 849). Thus, a violation of the securities laws will not be found where "the disclosed information is so general that the recipient thereof is still 'undertaking a substantial economic risk that his tempting target will prove to be a "white elephant." ' " *SEC v. Monarch Fund*, 608 F.2d 938, 942 (2d Cir.1979) (quoting *United States v. Chiarella*, 588 F.2d 1358, 1366–67 (2d Cir.1978), *rev'd on other grounds*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)). However, because a merger is one of the most important events that can occur for a small company, information regarding a merger "can become material at an earlier stage than would be the case as regards lesser transactions." *SEC v. Geon Indus., Inc.*, 531 F.2d 39, 47 (2d Cir.1976). Moreover, where information regarding a merger originates from an insider, the information, even if not detailed, "takes on an added charge just because it is inside information." *Id.* at 48; *see also Monarch Fund*, 608 F.2d at 942. And a major factor in determining whether information was material is the importance attached to it by those who knew about it. *See Texas Gulf Sulphur Co.*, 401 F.2d at 851.

In this case, it was reasonable for the district court to conclude the information material to Mayhew's and Piccolino's decisions to invest, in Piccolino's case for the first time in options and for the first time in Rorer securities. Although Mayhew had invested in Rorer prior to November 15, 1989, he had sold all his Rorer shares at a loss by that date. After the Thurman–Piccolino luncheon, Mayhew plunged heavily into Rorer stock and options, committing more than half of his portfolio to the investment. Although Mayhew was not given the specific details of the merger, a lesser level of specificity is required because he knew the information came from an insider and that the merger discussions were actual and serious. *See, e.g., Mylett*, 97 F.3d at 667; *SEC v. Shapiro*, 494 F.2d 1301, 1306–1307 (2d Cir.1974) (Information regarding a merger was material although "negotiations had not jelled to the point where a merger was probable."); *see also Holmes v. Bateson*, 583 F.2d 542, 558 (1st Cir.1978) (merger negotiations material although parties had not discussed precise terms); *SEC v. Gaspar*, No. 83 Civ. 3037(CBM), 1985 WL 521, at *14–*15 (S.D.N.Y. Apr. 16, 1985) (merger negotiations material although they did not proceed to making of actual tender offer). We see no basis for disturbing the district court's conclusions that a reasonable investor would find the information to have significantly altered the total mix of available information and that the information was, thus, material.

### C. "In Connection With" A Tender Offer

Finally, Mayhew claims that the district court erred in finding that the tip he

received was "in connection with" a tender offer because, at the time he received the tip, Rorer and RPSA had not taken "substantial steps" toward a tender offer as evidenced by the fact that RPSA did not make the tender offer for another two months. Alternatively, Mayhew argues that the two month lag between the tip and tender offer precludes a finding that the tip was "in connection with" a tender offer under § 14(e) as a matter of law. *See, e.g., Frankel v. Slotkin,* 705 F.Supp. 105, 109 (E.D.N.Y.1989), *aff'd,* 984 F.2d 1328 (2d Cir.1993). We disagree.

Liability under Rule 14e–3 attaches only when a "substantial step or steps" have been taken to accomplish a tender offer. *See* 17 C.F.R. § 240.14e–3(a); *Chestman,* 947 F.2d at 557. We have no difficulty in concluding that, in this case, such steps had been taken. Prior to Mayhew's November 1989 conversation with Piccolino, Rorer and RPSA had retained a consulting firm, signed confidentiality agreements, and held meetings between top officials. These steps satisfy the substantiality requirement of Rule 14e–3. *See, e.g., SEC v. Maio,* 51 F.3d 623, 636 (7th Cir.1995) (meeting of officials "much more serious than any previous discussion between the parties" satisfies substantial steps requirement); *SEC v. Musella,* 578 F.Supp. 425, 443–44 (S.D.N.Y.1984) (retaining law firm before tender offer is a substantial step); *Camelot Indus., Corp. v. Vista Resources, Inc.,* 535 F.Supp. 1174, 1183 (S.D.N.Y.1982) (meeting between officers is a substantial step).

■ Moreover, liability can attach under § 14(e) even though there is a two month lag between the tip and the tender offer. Congress intended § 14(e) to be a broad antifraud remedy in the area of tender offers. *See Piper v. Chris–Craft Indus., Inc.,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977); *see also O'Hagan,* — U.S. —, —, 117 S.Ct. 2199, 2216, 138 L.Ed.2d 724; *see also Russo,* 74 F.3d at 1390–91 (noting that "in connection with" language of § 10(b) satisfied where deceptive practice touches sales of securities); *In re Ames Dep't Stores Inc. Stock Litigation,* 991 F.2d 953, 964–68 (2d Cir.1993) (rejecting narrow interpretation of § 10(b)'s "in connection with" language).

Any arbitrary temporal limit would frustrate that purpose. It would permit parties to freely misuse information regarding a tender offer "up to [that limit], thus defeating in substantial part the very purpose of the Act—informed decisionmaking by shareholders." *Lewis v. McGraw,* 619 F.2d 192, 195 (2d Cir.1980) (per curiam). Instead, we must decide whether information is "in connection with" a tender offer on the facts of each particular case. *See e.g., Maio,* 51 F.3d at 636.

■ In this case, the nexus between the tip and the tender offer is self-evident. The information disclosed that Rorer was engaged in actual ongoing discussions with a merger candidate or candidates. The information had no value whatsoever except "in connection with" Mayhew's subsequent purchase of securities in anticipation of the tender offer. *Cf. SEC v. Materia,* 745 F.2d 197, 203 (2d Cir.1984). *See generally O'Hagan,* at — – —, 117 S.Ct. 2199, 2208–11 (Section 10(b)'s "in connection with" requirement satisfied, under misappropriation theory, where "fiduciary's fraud is consummated ... when, without disclosure to his principal, he uses the information to purchase or sell securities."). Because, at the time Mayhew traded in Rorer's securities, Rorer and RPSA had taken substantial steps toward the tender offer, and because the information concerned the tender offer and derived value from its nexus to the tender offer, we easily conclude that the "in connection with" requirement of § 14(e) is satisfied.

## II. *Insider Trading Sanctions Act*

■ Finally, we turn to the Commission's cross-appeal on the issue of civil penalties under the Insider Trading Sanctions Act, 15 U.S.C. § 78u–1(a). In its opinion, the district court overlooked the Commission's claim for civil penalties and therefore awarded none. The Commission failed to bring this omission to the district court's attention, and now asks us to remand to the district court to reconsider its failure to award civil penalties. We decline to do so.

■ Generally, a party disadvantaged by a district court's ruling is not required to

**54**

move for reconsideration in the district court as a precondition to an appeal from the ruling. *Richardson v. Oldham,* 12 F.3d 1373, 1377 (5th Cir.1994); *Chicago College of Osteopathic Medicine v. George A. Fuller Co.,* 719 F.2d 1335, 1349 n. 24 (7th Cir.1983); 11 Charles Alan Wright, et al., Federal Practice and Procedure § 2818 (2d ed.1995). This is not, however, a case where the district court issued a disadvantageous ruling, but gave insufficient reasons, *see, e.g., Cohen v. FB Air, Inc.,* 995 F.2d 378, 379 (2d Cir.1993); nor is it one where the district court adverted to the issue but chose not to reach it because it found another dispositive, *see, e.g., Musso v. Hourigan,* 836 F.2d 736, 742 (2d Cir.1988). In this case, the district court simply never addressed the issue of ITSA penalties at all.

We will not fault the trial court for failing to award penalties under the ITSA, where the Commission never brought the district court's omission to its attention. "Had such [a] procedure been followed the trial court could, in the light of all the facts then recently before it, have passed upon this point." *Vaught v. Childs Co.,* 277 F.2d 516, 518 (2d Cir.1960) (failure to raise motion for new trial precluded appeal on issue of whether jury verdict in personal injury case was excessive); *see, e.g., Velazquez v. Figueroa–Gomez,* 996 F.2d 425, 427 (1st Cir.1993) (appellant precluded from seeking new trial on appeal where he did not raise new trial motion in district court); *Baker v. Dillon,* 389 F.2d 57, 58 (5th Cir.1968) (failure of defendant to make a motion for reconsideration of the amount of the jury award precluded appeal on the point). This is fully consistent with the general policy underlying error preservation that the best place to correct error in the first instance is in the trial court where, for reasons of economy and sound judicial administration, the principal focus of the litigation should be. We therefore deny the Commission's cross-appeal.

## CONCLUSION

For the reasons stated above, we affirm the district court's holding of liability as to Mayhew under § 14(e) and Rule 14e–3 and refuse the Commission's request to remand the case to the district court for imposition of civil damages under the Insider Trading Sanctions Act.