

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-10-2000

# Semerenko v. Cendant Corp

Precedential or Non-Precedential:

Docket 99-5355

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation
"Semerenko v. Cendant Corp" (2000). *2000 Decisions.* Paper 163.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/163

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 10, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5355

GEORGE SEMERENKO

v.

CENDANT CORP.; WALTER A. FORBES; E. KIRK
SHELTON; COSMO CORIGLIANO; CHRISTOPHER K.
MCLEOD; ERNST & YOUNG LLP

George Semerenko, individually and on behalf of all
others similarly situated.

        Appellant

(D.C. Civil No. 98-05384)

No. 99-5356

P. SCHOENFELD ASSET MANAGEMENT LLC,
on behalf of itself and all others similarly situated,

        Appellant

v.

CENDANT CORP.; WALTER A. FORBES;
E. KIRK SHELTON; COSMO CORIGLIANO;
CHRISTOPHER K. MCLEOD; ERNST & YOUNG LLP

(D.C. Civil No. 98-04734)

On Appeal from the United States District Court
for the District of New Jersey
District Judge: Honorable William H. Walls

Argued March 21, 2000

BEFORE: MANSMANN and GREENBERG, Circuit Judges
and ALARCON, Senior Circuit Judge*

(Opinion Filed: June 16, 2000)
(Amended Opinion Filed: August 10, 2000)

        Arthur N. Abbey [Argued]
        Jill S. Abrams
        Stephen J. Fearon, Jr.
        Nancy Kaboolian
        Abbey, Gardy & Squitieri, LLP
        212 East 39th Street
        New York, NY 10016

        Allyn Z. Lite
        Joseph J. DePalma
        Mary Jean Pizza
        Lite DePalma Greenberg &
         Rivas, LLC
        Two Gateway Center – 12th Floor
        Newark, NJ 07102–5003

        Andrew Barroway
        David Kessler
        Schiffrin & Barroway
        Three Bala Plaza East – Suite 400
        Bala Cynwyd, PA 19004

         Attorneys for Appellants
        George Semerenko and
        P. Schoenfeld Management, LLC
_____

* The Honorable Arthur L. Alarcon, Senior Judge of the United States
Court of Appeals for the Ninth Circuit, sitting by designation.

Jonathan J. Lerner
Samuel Kadet [Argued]

Skadden, Arps, Slate, Meagher &
Flom LLP
Four Times Square
New York, NY 10036

Michael M. Rosenbaum
Carl Greenberg
Budd Larner Gross Rosenbaum
 Greenberg & Sade, P.C.
150 John F. Kennedy Parkway
CN 1000
Short Hills, NJ 07078-0999

 Attorneys for Appellee
Cendant Corporation

James M. Hirschhorn
Steven S. Radin
Sills Cummis Radin Tischman
Epstein & Gross, P.A.
One Riverfront Plaza
Newark, NJ 07102-5400

Dennis J. Block [Argued]
Howard R. Hawkins, Jr.
Cadwalader, Wickersham & Taft
100 Maiden Lane
New York, NY 10038

Greg A. Danilow
Timothy E. Hoeffner
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

 Attorney for Appellees
Walter Forbes and Christopher
McLeod

3

Richard Schaeffer [Argued]
Bruce Handler
Dornbush Mensch Mandelstam &
 Schaeffer, LLP
747 Third Avenue
New York, NY 10017

 Attorneys for Appellee
E. Kirk Shelton

Gary P. Naftalis
Kramer, Levin, Naftalis & Frankel
919 Third Avenue
New York, NY 10022

 Attorney for Appellee
Cosmo Corigliano

Alan N. Salpeter
Michele Odorizzi
Mayer, Brown & Platt
190 South LaSalle Street
Chicago, IL 60603

William P. Hammer, Jr.
J. Andrew Heaton [Agrued]
Ernst & Young LLP
1225 Connecticut Avenue, NW
Washington, D.C. 20036

Douglas S. Eakeley
Lowenstein Sandler
65 Livingston Avenue
Roseland, NJ 07068

 Attorneys for Ernst & Young LLP

4

Harvey J. Goldschmid
General Counsel

Jacob H. Stillman
Solicitor

Eric Summergrad
Deputy Solicitor

Hope Hall Augustini
Special Counsel

Securities & Exchange Commission
450 Fifth Street, N.W.
Washington, D.C. 20549-0606

Attorneys for Amicus-Appellant
Securities and Exchange
Commission

OPINION OF THE COURT

ALARCON, Senior Circuit Judge.

I

The P. Schoenfeld Asset Management LLC and the class of similarly situated investors (collectively, the"Class") appeal from the order of the district court dismissing their claims for securities fraud pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Class's complaint was filed under S 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5. The complaint also alleged that the individual defendants were liable for the underlying violations of S 10(b) and Rule 10b-5 as control persons under S 20(a) of the Exchange Act.

We conclude that the complaint alleges sufficient facts to establish the elements of reliance and loss causation, and that the district court applied the incorrect analysis for determining whether the complaint alleges that the purported misrepresentations were made "in connection with" the purchase or the sale of a security. Because the standard that we have articulated for the "in connection

5

with" requirement is different from the one applied by the district court, we vacate the judgment below and remand the matter for further proceedings. Given that we do not resolve whether the dismissal was proper under S 10(b) and Rule 10b–5, we do not address the dismissal of the Class's claim under S 20(a).

II

The Class filed this action against the Cendant Corporation ("Cendant"),1 its former officers and directors Walter A. Forbes, E. Kirk Shelton, Christopher K. McLeod, and Cosmo Corigliano (the "individual defendants"), and its accountant Ernst & Young LLP ("Ernst & Young") (collectively, the "defendants"). The Class alleges that the defendants violated S 10(b) and Rule 10b–5 by making certain misrepresentations about Cendant during a tender offer for shares of American Bankers Insurance Group, Inc. ("ABI") common stock. The Class consists of persons who purchased shares of ABI common stock during the course of the tender offer. The class period runs from January 27, 1998 to October 13, 1998. The complaint does not allege that any member of the Class purchased securities issued by Cendant, or that any member of the Class tendered shares of ABI common stock to Cendant. Instead, it alleges that the defendants made certain misrepresentations about Cendant that artificially inflated the price at which the Class purchased their shares of ABI common stock, and that the Class suffered a corresponding loss when those misrepresentations were disclosed to the public and the merger agreement was terminated. In light of the procedural posture of this case, we must assume the truth of the facts alleged in the complaint. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997).

On December 22, 1997, the American International Group, Inc. ("AIG") announced that it would acquire one

_____

1. Cendant was formed on December 17, 1997 as the surviving entity in a merger between HFS Inc. and CUC International, Inc. In the interests of simplicity, and because the merger predates the class period, we refer to Cendant as including its predecessor organizations.

6

hundred percent of the outstanding shares of ABI common stock for $47 per share. On January 27, 1998, Cendant made a competing tender offer to purchase the same shares at a price of $58 per share, or a total price of approximately $2.7 billion. In conjunction with its tender offer, Cendant filed with the Securities and Exchange Commission (the "SEC") a Schedule 14D-1 that overstated its income during prior financial reporting periods.

On March 3, 1998, AIG matched Cendant's bid and offered to pay ABI shareholders $58 for each share of outstanding ABI common stock. Cendant eventually raised its bid price to $67 per share. It then executed an agreement to purchase ABI for approximately $3.1 billion, payable in part cash and in part shares of Cendant common stock. Cendant filed an amendment to its Schedule 14D-1 on March 23, 1998 reporting the terms of the merger agreement. Eight days later, Cendantfiled a Form 10-K reporting its financial results for the 1997 fiscal year.

After the close of trading on April 15, 1998, Cendant announced that it had discovered potential accounting irregularities, and that its Audit Committee had engaged Willkie, Farr & Gallagher and Arthur Andersen LLP to perform an independent investigation. Cendant also announced that it had retained Deloitte & Touche LLP to reaudit its financial statements, and that "[i]n accordance with [Statement of Accounting Standards] No. 1, the Company's previously issued financial statements and auditors' reports should not be relied upon." Nevertheless, the April 15, 1998 announcement reported that the irregularities occurred in a single business unit that "accounted for less than one third" of Cendant's net income, and it indicated that Cendant would restate its annual and quarterly earnings for the 1997 fiscal year by $0.11 to $0.13 per share. Immediately after Cendant disclosed the accounting irregularities, the price of ABI common stock dropped from $64-7/8 to $57-3/4, representing an eleven percent decrease from the price at which the shares had been trading.

Following the April 15 announcement, Cendant made several pubic statements in which it represented that it was

7

committed to completing the merger with ABI notwithstanding the discovery of the accounting irregularities. On April 27, 1998, Walter A. Forbes, the chairman of the board of directors of Cendant, and Henry R. Silverman, the president and the chief executive officer of Cendant, issued a letter to Cendant shareholders, which was published in the financial press. That letter states:

> We are outraged that the apparent misdeeds of a small number of individuals within a limited part of our company has adversely affected the value of your investment -- and ours -- in Cendant. We are working together diligently to clear this matter up as soon as possible. We fully support the Audit Committee's investigation and continue to believe that the strategic rationale and industrial logic of the HFS/CUC merger that created Cendant is as compelling as ever.

> Cendant is strong, highly liquid, and extremely profitable. The vast majority of Cendant's operating businesses and earnings are unaffected and the prospects for the Company's future growth and success are excellent.

> We have reaffirmed our commitment to completing all pending acquisitions: American Bankers, National Parking Corporation and Providian Insurance.

In a press release issued on May 5, 1998, Cendant stated that "over eighty percent of the Company's net income for the first quarter of 1998 came from Cendant business units not impacted by the potential accounting irregularities."

On July 14, 1998, Cendant revealed that the April 15, 1998 announcement anticipating the restatement of its financial results for the 1997 fiscal year was inaccurate, and that the actual reduction in income would be twice as much as previously announced. Cendant further acknowledged that its investigation had uncovered several accounting irregularities that had not previously been disclosed, and that those accounting irregularities affected additional Cendant business units and other fiscal years. Cendant estimated that earnings would be reduced by as much as $0.28 per share in 1997. After the July 14, 1998 disclosure, the price of ABI common stock dropped until

8

Cendant issued several public statements indicating that it intended to continue the tender offer and that it was "contractually committed" to completing the ABI merger. Thereafter, the market price of ABI common stock was "buoyed" by Cendant's repeated statements that it was committed to completing the merger.

On August 13, 1998, Cendant issued a press release announcing that its investigation into the accounting irregularities was complete. The release stated that Cendant would restate its earnings by $0.28 per share in 1997, by $0.19 per share in 1996, and by $0.14 per share in 1995. On August 27, 1998, Cendant issued a statement that the board of directors had adopted the audit report. The audit report was publicly filed with the SEC on August 28, 1998, and a copy was forwarded to the United States Attorney for the District of New Jersey. The report includedfindings that "fraudulent financial reporting" and other"errors" inflated Cendant's pretax income by approximately $500 million from 1995 to 1997, and that Forbes and Shelton were "among those who must bear responsibility." After the audit report was filed with the SEC, the price of ABI common stock closed at $53-1/2 per share on August 28, 1998 and fell further to a closing price of $51-7/8 per share on August 31, 1998, the first day of trading following the disclosure.

On September 29, 1998, Cendant filed an amended Form 10-K for the 1997 fiscal year announcing that Cendant had actually lost $217.2 million in 1997 rather than earning $55.5 million, as previously reported. That announcement caused the price of ABI common stock to drop further to $43 per share by the close of trading. On October 13, 1998, Cendant and ABI announced that they were terminating the merger agreement, and that Cendant would pay ABI a $400 million dollar break up fee, despite the fact that it was not contractually bound to do so. The termination agreement, which was executed the same day, provided that the termination of the merger would not result in liability on the part of Cendant or ABI, or on the part of any of their directors, officers, employees, agents, legal and financial advisors, or shareholders. In response to the disclosure, the price of ABI common stock dropped to $35-1/2 per share by the end of the day.

On October 14, 1998, the day after Cendant and ABI disclosed the termination of the planned merger, the Class filed a complaint in the United States District Court for the District of New Jersey alleging that Cendant and the individual defendants violated S 10(b) and Rule 10b-5 by making fraudulent misrepresentations concerning Cendant's financial condition, its willingness to complete the tender offer, and its willingness to complete the proposed merger. The complaint also alleged that the individual defendants were liable for those violations as control persons under S 20(a). The Class subsequently amended its complaint to expand the class period and to name Ernst & Young as an additional defendant in its claims under S 10(b) and Rule 10(b)(5).2

The defendants filed a motion to dismiss the Class's complaint pursuant to Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure. The district court granted the motion and entered an order dismissing the complaint under Rule 12(b)(6). In explaining its dismissal order, the district court stated that the complaint failed to establish that the alleged misrepresentations were made "in connection with" the Class's purchases of ABI common stock, that the Class reasonably relied on the purported misrepresentations, and that the Class suffered a loss as the proximate result of the purported misrepresentations. The order also dismissed the Class's S 20(a) claim against the individual defendants on the basis that a claim for control person liability cannot be maintained in the absence of an underlying violation of the Exchange Act. In light of its decision to dismiss the complaint pursuant to Rule 12(b)(6), the district court declined to consider whether the Class's complaint also failed to satisfy the heightened pleading requirements of Rule 9(b).

_____

2. We note that the Class also alleged in its amended complaint that Cendant and the individual defendants violated S 14(e) of the Williams Act by making purported misrepresentations in connection with the tender offer. See 15 U.S.C. S 78n(e). We do not discuss that claim, however, because the Class has chosen to abandon it on appeal.

III

Before we address the merits of the Class's arguments, we must first resolve an important question that concerns our jurisdiction to hear this appeal pursuant to 28 U.S.C. S 1291. In reviewing this matter, it came to our attention that the district court did not indicate whether it intended to dismiss all of the Class's claims with or without prejudice. In fact, the order denying the Class's motion for leave to amend suggests that the dismissal was without prejudice inasmuch as it did not foreclose the Class from submitting a second motion for leave to amend with a proposed complaint attached. The order states:

> Plaintiffs have requested leave to amend their complaints if any or all of their claims are dismissed. However, plaintiffs have not detailed the substance of any amendment or presented to the Court a proposed amended complaint. Although plaintiffs no longer have the right to amend their complaints as a matter of course after those complaints have been dismissed, the Court may still permit amendment as a matter of discretion. Kauffman v. Moss, 420 F.2d 1270, 1276 (3d Cir.) cert. denied, 400 U.S. 846, 91 S. Ct. 93, 27 L. Ed.2d 84 (1970). However, the Court will not consider plaintiffs' requests until they submit the sought amendment for the Court's review. The present complaints lack legal vitality. Without scrutiny of the proposed amendment, the Court cannot determine whether it, the amendment, would be resuscitable or futile. Plaintiffs' motion for leave to amend is denied.

This court has held that a dismissal without prejudice is not a final and appealable order under S 1291, unless the plaintiff can no longer amend the complaint or unless the plaintiff declares an intention to stand on the complaint as dismissed. See Nyhuis v. Reno, 204 F.3d 65, 68 n.2 (3d Cir. 2000); In re Westinghouse Sec. Litig., 90 F.3d 696, 705 (3d Cir. 1996); Borelli v. City of Reading, 532 F.2d 950, 951–52 (3d Cir. 1976) (per curiam). The Class did not advise the district court that it could no longer amend its pleadings, or that it had elected to stand on the complaint. Instead, it filed a notice of appeal with this court. In its opening brief, the Class represented that "[t]his court has jurisdiction over

11

this appeal under 28 U.S.C. S 1291 because the district court's opinion and order dismissed of all claims with respect to all parties without leave to replead."

On March 1, 2000, this court ordered the parties to submit further briefing on the question whether the district court had entered a final, appealable order. In its supplemental brief, the Class indicated that it intended to stand on its complaint for the purposes of our review of whether the dismissal was proper under Rule 12(b)(6), but not for the purposes of our independent review of whether the complaint complied with Rule 9(b). In effect, the Class took the position that it could stand on its complaint to satisfy the final judgment rule and, at the same time, avoid a de novo review of whether the complaint pleads the element of scienter with sufficient particularity.

Our own research indicates that the Class's position is consistent with the law of this circuit. In Shapiro v. UJB Financial Corp., 964 F.2d 272 (3d Cir. 1992), this court recognized that a plaintiff may amend a complaint to comply with the particularity requirements of Rule 9(b) even after the plaintiff stands on the complaint to invoke the court's appellate jurisdiction under 28 U.S.C. S 1291. In that case, the district court dismissed all of the plaintiffs' claims for securities fraud under Rule 12(b)(6) and, alternatively, dismissed a number of the plaintiffs' claims for failing to plead scienter with the particularity required by Rule 9(b). The district court also granted the plaintiffs leave to file an amended complaint to cure some of the defects identified in its order. See id. at 277–78. Rather than filing an amended complaint, however, the plaintiffs formally announced that they would stand on their complaint. See id. at 278. On review, this court concluded that the district court incorrectly dismissed several of the plaintiffs' claims pursuant to Rule 12(b)(6). See id. at 280–284. Despite the fact that the plaintiffs had elected to stand on their complaint as dismissed, this court declined to affirm the dismissal under Rule 9(b). See id. at 285 & n.14. Instead, it remanded the matter to the district court to grant the plaintiffs leave to amend those claims which were properly dismissed pursuant to Rule 9(b) and to evaluate whether the remaining claims satisfied the rule's heightened pleading requirements. See id.

In this matter, the district court did not consider the sufficiency of the allegations under Rule 9(b)."[B]ecause we are hesitant to preclude the prosecution of a possibly meritorious claim because of defects in the pleadings," the Class should be "afforded an additional, albeitfinal opportunity, to conform the pleadings" in the event that its complaint fails to comply with Rule 9(b).3  In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1435 (quoting Ross v. A.H. Robins Co., 607 F.2d 545, 547 (2d Cir. 1979)). We leave it to the district court, however, to determine, in the first instance, whether such an amendment is required. See Shapiro, 964 F.2d at 285 n.14. We hold, consistent with the law of this circuit, that we have jurisdiction to hear the merits of this appeal pursuant to S 1291. See Shapiro, 964 F.2d at 278. Our review is limited to the question whether the dismissal was proper under Rule 12(b)(6).

IV

Our review of a district court's decision to grant a motion to dismiss is plenary. See Weiner v. Quaker Oats Co., 129 F.3d 310, 315 (3d Cir. 1997). "A motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to [the] plaintiff, [the] plaintiff is not entitled to relief. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1420 (quotations and citations omitted). In this case, we may affirm only if it appears that the Class could prove no set of facts that would entitle it to relief. See Weiner, 129 F.3d at 315.

Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security, . . .[of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. S 78j(b). Rule 10b-5, which was promulgated under S 10(b), makes it unlawful

_____

3. We note that the Class is not free to add new factual allegations to comply with Rule 12(b)(6). See Shapiro, 964 F.2d at 284.

13

for any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made in the light of the circumstances under which they were made, not misleading. . . in connection with the purchase or sale of any security." 17 C.F.R. S 240.10b-5(b). To state a valid claim under Rule 10b-5, a plaintiff must show that the defendant (1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff 's reliance was the proximate cause of his or her injury. See Weiner, 129 F.3d at 315; In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1417.

In the present case, the defendants make numerous arguments to support the dismissal of the Class's complaint pursuant to Rule 12(b)(6). They contend that the district court correctly concluded that the alleged misrepresentations were not made "in connection with" the purchase or the sale of a security. They also suggest that the Class could not have reasonably relied on any of the alleged misrepresentations, and that the alleged misstatements were not the proximate cause of the Class's loss. We address each argument, below, under a separate heading.

A.

We must first decide whether the Class's complaint pleads sufficient facts to satisfy the "in connection with" requirement of S 10(b) and Rule 10b-5. The parties have expressed much disagreement over the standard that this court applies in determining whether an alleged misrepresentation was made "in connection with" the purchase or the sale of a security. The defendants, in varying respects, contend that the alleged misrepresentations must speak directly to the investment value of the security that is bought or sold, and that they must have been made with the specific purpose or objective of influencing an investor's decision. In contrast, the Class and the SEC, as amicus curiae, argue that the "in connection with" requirement is satisfied whenever a

14

misrepresentation is made in a manner that is reasonably calculated to influence the investment decisions of market participants. Recognizing that "the `in connection with' phrase is not the least difficult aspect of the 10b-5 complex to tie down," we take this opportunity to clarify the standard that governs this matter. Chemical Bank v. Arthur Anderson & Co., 726 F.2d 930, 942 (2d Cir. 1984) (noting the difficulty in establishing a test for the"in connection with" requirement) (quotations and citations omitted).

In Ketchum v. Green, 557 F.2d 1022 (1977), this court considered the question whether certain misrepresentations arising out of an internal contest for the control of a closely held corporation were made "in connection with" the subsequent forced redemption of the losing parties' stock. There, a group of minority shareholders secretly conspired to remove the two majority shareholders from their respective positions as the chairman of the board of directors and as the president of the corporation. See Ketchum, 557 F.2d at 1023-24. By misrepresenting their intentions concerning the election of corporate officers, the minority shareholders were able to persuade the majority shareholders to elect them to a majority of the seats on the board of directors. See id. After gaining control of the board of directors, the minority shareholders immediately voted to remove the two majority shareholders from their officerships. See id. To entrench themselves, they also passed resolutions terminating the majority shareholders' employment and authorizing the mandatory repurchase of the majority shareholders' stock pursuant to a stock retirement agreement. The majority shareholders brought an action pursuant to S 10(b) and Rule 10b-5 to enjoin their ouster from the corporation and to obtain damages. See id. at 1024. On review, this court held that the majority shareholders failed to establish that the complained of misrepresentations were made "in connection with" the purchase or the sale of a security. See id. at 1027-29. In addition to noting that the case fell within an"internal corporate mismanagement" exception to S 10(b) and Rule 10b-5, the court reasoned that the degree of proximity between the claimed fraud and the securities transaction was simply too attenuated for the case to fall within the scope of the federal securities laws. See id.  at 1028-29

15

This court again considered the contours of the "in connection with" requirement in Angelastro v. Prudential-Bache-Sec., Inc., 764 F.2d 939 (3d Cir. 1985), when it addressed the question whether a brokerage firm could be held liable under S 10(b) and Rule 10b-5 for making misrepresentations concerning the terms of its margin accounts. In that case, a class of investors sued a national brokerage firm for misrepresenting both the specific interest rates that it would charge in connection with a margin purchase and the formula that it would apply in calculating those rates. See Angelastro, 764 F.2d at 941. The district court dismissed the investors' complaint on the basis that the alleged misrepresentations were not made "in connection with" the purchase or the sale of a security. See id. This court reversed, holding that the investors could pursue their claims under S 10(b) and Rule 10b-5. The court reasoned that the requisite causal connection was satisfied by the brokerage firm's fraudulent course of dealing, notwithstanding the fact that the alleged misrepresentations did not relate to the merits of a security. See id. at 944-45. In holding in favor of the class, the court specifically noted that "Rule 10b-5 also encompasses misrepresentations beyond those implicating the investment value of a particular security." Id.

While the decisions in Ketchum and Angelastro are illustrative of the point that the "in connection with" language requires a causal connection between the claimed fraud and the purchase or the sale of a security, and that the misrepresentations need not refer to a particular security, they are not helpful in applying the standard to the facts of this case. This case does not present a claim based on allegations of internal corporate misconduct arising from a contest for the control of a closely held corporation. See Ketchum, 557 F.2d at 1028. Nor does it concern a fraudulent course of dealing by a brokerage firm. See Angelastro, 764 F.2d at 944. Rather, it involves the public dissemination of allegedly misleading information into an efficient securities market. In light of the law of this circuit that the scope of the "in connection with" requirement must be determined on a case-by-case basis, we are compelled to look elsewhere in deciding the standard

16

that governs this matter.4 See Ketchum, 557 F.2d at 1027; Angelastro, 764 F.2d at 942-43, 945.

In resolving the issue before us, we are persuaded by recent decisions in the Second Circuit and the Ninth Circuit that have addressed the scope of the "in connection with" requirement when the alleged fraud involves the public dissemination of false and misleading information. See In re Ames Dep't Stores Inc. Stock Litig., 991 F.2d 953, 956, 965-66 (2d Cir. 1993) (involving the public dissemination of false information in publicly filed offering documents, press releases, and research reports); McGann v. Ernst & Young, 102 F.3d 390, 392-93 (9th Cir. 1996) (involving the public dissemination of false information in a publiclyfiled annual report). Those courts have generally adopted the standard articulated in Securities & Exch. Comm'n v. Texas Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir. 1968) (in banc), and applied an objective analysis that considers the alleged misrepresentation in the context in which it was made.5 They have held that, where the fraud alleged involves the public dissemination of information in a medium upon which an investor would presumably rely, the "in connection with" element may be established by proof of

_____

4. Despite the arguments of the defendants, we do not find the Second Circuit's decision in Chemical Bank instructive in the present inquiry. In that case, a corporation misrepresented its financial status to a commercial lender when it pledged the securities of a subsidiary as collateral for a loan. See Chemical Bank, 726 F.2d at 944-45. The court held that the misrepresentations were "merely an incident in a transaction not otherwise involving the purchase or sale of securities" and dismissed the lender's action under S 10(b). Id. at 944 n.24. As this court has previously pointed out, the "Second Circuit was concerned that every bank loan partially secured by the pledge of stock might fall within the scope of [S] 10(b)." Angelastro, 764 F.2d at 946. That concern is not present here, where the alleged fraud involves the public dissemination of allegedly false and misleading statements into an efficient securities market.

5. Contrary to the suggestions of the individual defendants, this court has adopted the standards articulated in Texas Gulf Sulphur Co. for determining whether the statutory requirements ofS 10(b) and Rule 10b-5 are satisfied. See Gottlieb v. Sandia American Corp., 452 F.2d 510, 515-16 (3d Cir. 1971) (adopting the Texas Gulf Sulphur Co. test as the statutory test for actions arising under S 10(b)).

17

the materiality of the misrepresentation and the means of its dissemination. See In re Ames Dep't Stores Inc. Stock Litig., 991 F.2d at 963, 965; Securities & Exch. Comm'n v. Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir. 1993); In re Leslie Fay Cos. Sec. Litig., 871 F. Supp. 686, 697 (S.D.N.Y. 1995). Under that standard, it is irrelevant that the misrepresentations were not made for the purpose or the object of influencing the investment decisions of market participants. See In re Ames Dep't Stores Inc. Stock Litig., 991 F.2d at 965 (holding that an investor's reliance need not be envisioned to give rise to liability underS 10(b) and Rule 10b–5).

We conclude that the materiality and public dissemination approach should apply in this case. The purpose underlying S 10(b) and Rule 10b–5 is to ensure that investors obtain fair and full disclosure of material facts in connection with their decisions to purchase or sell securities. See Angelastro, 764 F.2d at 942. That purpose is best satisfied by a rule that recognizes the realistic causal effect that material misrepresentations, which raise the public's interest in particular securities, tend to have on the investment decisions of market participants who trade in those securities. See In re Ames Dep't Stores Inc. Stock Litig., 991 F.2d at 966. We therefore adopt the reasoning of the Second Circuit and the Ninth Circuit and hold that the Class may establish the "in connection with" element simply by showing that the misrepresentations in question were disseminated to the public in a medium upon which a reasonable investor would rely, and that they were material when disseminated. We also point out that, under the standard which we adopt, the Class is not required to establish that the defendants actually envisioned that members of the Class would rely upon the alleged misrepresentations when making their investment decisions. See In re Ames Dep't Stores Inc. Stock Litig., 991 F.2d at 965; In re Leslie Fay Cos. Sec. Litig. , 871 F. Supp. at 697–98. Rather, it must only show that the alleged misrepresentations were reckless. See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3d Cir. 1999) (reaffirming that S 10(b) and Rule 10b–5 cover reckless misrepresentations).

18

In its petition for rehearing, Ernst & Young contends that the alleged misrepresentations contained in thefinancial statements and audit reports that it prepared for Cendant should not be deemed to have been made "in connection with" the purchase of ABI common stock unless it was reasonably foreseeable that they would be incorporated in the tender offer documents. We agree. The Supreme Court has warned that "[a]ny person or entity, including a lawyer, accountant, or bank who employs a manipulative device or makes a material misstatement . . . on which a purchaser relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability are met." Central Bank of Denver, N.A. v. First Interestate Bank of Denver, N.A., 511 U.S. 164, 191 (1994) (emphasis in original). Because an accountant is blameless where it could not reasonably have foreseen that its representations would be used in the purchase or the sale of securities, however, the Class must also establish that Ernst & Young knew, or that it had reason to know, that Cendant would use its financial statements and audit reports when making the tender offer for shares of ABI common stock. See McGann, 102 F.3d at 397 (holding that the "in connection with" requirement was satisfied for the purposes of Rule 12(b)(6) where the plaintiffs "squarely alleged that the [auditor] knew that [its client] would include its audit opinion in a Form 10-K"); Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183 (7th Cir. 1993) (stating that "[t]o find the `connection' just because the managers, unbeknownst to the auditors, show the financial statements to some potential investor would abolish the requirement that the defendant's acts occur in connection with the purchase or sale of securities").

We emphasize, though, that it is no defense that the alleged misrepresentations were made in the context of a tender offer and a proposed merger, or that they did not specifically refer to the investment value of the security that was bought or sold. It is well established that information concerning a tender offer or a proposed merger may be material to persons who trade in the securities of the target company, despite the highly contingent nature of both types of transactions. See Basic Inc. v. Levinson, 485 U.S. 224, 238-39 (1988) (holding that preliminary merger

19

discussions may be material even before an agreement-in-principle is reached); Securities & Exch. Comm'n v. Materia, 745 F.2d 197, 199 (2d Cir. 1984) (stating that "even a hint of an upcoming tender offer may send the price of the target company's stock soaring"); Securities & Exch. Comm'n v. Maio, 51 F.3d 623, 637 (7th Cir. 1995) (holding that undisclosed information concerning a tender offer was sufficiently material to give rise to liability for insider trading under Rule 10b-5 and Rule 14e-3); Securities & Exch. Comm'n v. Mayhew, 916 F. Supp. 123, 131 (D. Conn. 1995) (holding that undisclosed information concerning a pending merger was sufficiently material to give rise to liability for insider trading under S 10(b)). It is also settled that S 10(b) and Rule 10b-5 encompass misrepresentations beyond those concerning the investment value of a particular security. See Angelastro, 764 F.2d at 942-44 (holding that a brokerage firm may be liable for misrepresenting the terms of a margin account); cf. Deutschman v. Beneficial Corp., 841 F.2d 502, 508 (3d Cir. 1988) (holding that the purchaser of an option contract has standing to seek damages under S 10(b) for misrepresentations concerning the underlying securities). So long as the alleged misrepresentations were material, the "in connection with" requirement may be satisfied simply by showing that they were publicly disseminated in a medium upon which investors tend to rely, and, in the case of Ernst & Young, that it knew or had reason to know that Cendant would use its financial statements and audit reports when making a tender offer for shares of ABI common stock.

We do not resolve, however, whether the "in connection with" requirement is satisfied in the present case. Because the standard that we have set forth is different from the one applied by the district court, and because the parties have not been afforded a full opportunity to brief the issues of materiality and public dissemination, we will remand this matter to allow the district court to consider, in the first instance, the question whether the Class's complaint pleads sufficient facts to satisfy the requirements of Rule 12(b)(6).6

_____

6. The parties' briefs consider whether it was reasonable for the Class to rely on some of the defendants' statements. On remand, the parties are

20

We note, however, that the issue of materiality typically presents a mixed question of law and fact, and that the delicate assessment of inferences is generally best left to the trier of fact. See Shapiro, 964 F.2d at 281 n.11. The district court should decide the issue of materiality as a matter of law only if the alleged misrepresentations are so clearly and obviously unimportant that reasonable minds could not differ in their answers to the question. See Weiner, 129 F.3d at 317; In re Craftmatic Sec. Litig., 890 F.2d 628, 641 (3d Cir. 1990).

B.

We next turn to the question whether the Class's complaint alleges sufficient facts to establish the element of reliance. It is axiomatic that a private action for securities fraud must be dismissed when a plaintiff fails to plead that he or she reasonably and justifiably relied on an alleged misrepresentation. See Weiner, 129 F.3d at 315 (setting forth reliance as an element of a private right of action under S 10(b) and Rule 10-5); In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1417 (same). The defendants claim that the complaint fails to establish the element of reliance, because it alleges that the defendants' misrepresentations were made in the context of a tender offer and a proposed merger, that AIG made a competing tender offer to purchase shares of ABI common stock at $58 per share, and that Cendant issued a press release on April 15, 1998 warning investors not to rely on its prior representations concerning its financial condition.

Traditionally, purchasers and sellers of securities were required to establish that they were aware of, and directly

_____

bound by our holding with respect to those statements inasmuch as it addresses the issue of materiality. See In re Trump Casino Sec. Litig., 7 F.3d 357, 371 (3d Cir. 1993) (applying the bespeaks caution doctrine in the context of materiality). They are otherwise free to renew their motions and make any other arguments concerning the question of materiality as they see fit. See In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1248 n.16 (3d Cir. 1989). We note that, in the context of an efficient market, "the concept of materiality translates into information that alters the price of the firm's stock." In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1425.

21

misled by, an alleged misrepresentation to state a claim for securities fraud under S 10(b) and Rule 10b-5. See Peil v. Speiser, 806 F.2d 1154, 1160 (3d Cir. 1986) (discussing theories of reliance). Recognizing that the requirement of showing direct reliance presents an unreasonable evidentiary burden in a securities market where face-to-face transactions are rare and where lawsuits are brought by classes of investors, however, this court has adopted a rule that creates a presumption of reliance in certain cases. See id. Under the fraud on the market theory, a plaintiff in a securities action is generally entitled to a rebuttable presumption of reliance if he or she purchased or sold securities in an efficient market. See In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1419 n.8 (holding that a purchaser of securities in an open and developed market is entitled to a presumption of reliance).

The fraud on the market theory of reliance is, in essence, a theory of indirect actual reliance under which a plaintiff is entitled to three separate presumptions in attempting to establish the element of direct reliance. See Zlotnick v. Tie Communications, 836 F.2d 818, 822 (3d Cir. 1988). Under the fraud on the market theory of reliance, the court presumes (1) that the market price of the security actually incorporated the alleged misrepresentations, (2) that the plaintiff actually relied on the market price of the security as an indicator of its value, and (3) that the plaintiff acted reasonably in relying on the market price of the security. See id. The fraud on the market theory of reliance, however, creates only a presumption, which a defendant may rebut by raising any defense to actual reliance. See Basic, Inc., 485 U.S. at 248-49. This court has pointed out that the presumption of reliance may be rebutted by showing that the market did not respond to the alleged misrepresentations, or that the plaintiff did not actually rely on the market price when making his or her investment decision.7 See Zlotnik, 836 F.2d at 822; Peil, 806

_____

7. To rebut the presumption of reliance, a defendant may show that the misrepresentations were immaterial, that the market was aware that the misrepresentations were false, or that the misrepresentations were otherwise not assimilated into the price of the security. Of course, the

22

F.2d at 1161. This court has also held that a defendant may defeat the presumption of reliance by showing that the plaintiff 's reliance on the market price was actually unreasonable.8 See Zlotnik , 836 F.2d at 822; Peil, 806 F.2d at 1161.

In the present case, we are persuaded that the Class has sufficiently pleaded the element of reliance to withstand a challenge under Rule 12(b)(6) with respect to at least some of the alleged misrepresentations. The complaint alleges that ABI common stock traded in an open and developed market throughout the class period, that the market price of ABI common stock incorporated the alleged misrepresentations,9 and that the Class members purchased shares of ABI common stock in reliance on that

_____

defendant may also rebut the presumption by showing that the investor would have purchased or sold the securities at that price even with full knowledge of the misrepresentation, that the investor traded in the securities based on an actual belief that the market price was inaccurate, or that the investor's decision to trade was based on some factor other than the market price. See Basic, Inc., 485 U.S. at 248; Zlotnik, 836 F.2d at 822; Peil, 806 F.2d at 1161.

8. To establish that an investor's reliance was unreasonable, a defendant may show that the investor knew, or had reason to know, that the misrepresentations were in fact false. See Zlotnik, 836 F.2d at 822; Peil, 806 F.2d at 1161.

9. The market assimilates information concerning the possibility of a tender offer or a merger, and the amount of consideration that will be received, into the price of the securities of a target corporation. See Frank L. Easterbrook & Daniel R. Fischel, The Proper Role of a Target's Management in Responding to a Tender Offer, 94 Harv. L. Rev. 1161, 1164 (1981). "The value of any stock can be understood as the sum of two components: the price that will prevail in the market if there is no successful offer (multiplied by the likelihood that there will be none) and the price that will be paid in a future tender offer (multiplied by the likelihood that some offer will succeed)." Id . In this case, the defendants' misrepresentations were incorporated into the price of ABI common stock inasmuch as they spoke to the likelihood that the tender offer and the proposed merger would be successful, or to the extent that they related to the investment value of the Cendant shares that members of the Class were to receive in consideration for tendering their shares of ABI common stock.

23

price. The complaint also states that the Class was directly misled by the alleged misrepresentations. Those allegations, if true, are sufficient to establish direct reliance and to create a presumption of indirect actual reliance so long as the Class's reliance on the purported misrepresentations or the market price of ABI common stock was not unreasonable as a matter of law.

We conclude that it was reasonable for the Class members who purchased shares prior to March 3, 1998 to rely on the alleged misrepresentations occurring prior to that date. The defendants have not provided us with a legitimate reason for us to conclude to the contrary. Their arguments concern only the reasonableness of the reliance of the Class members who purchased shares of ABI common stock after March 3, 1998. They have no bearing on the investment decisions of persons who purchased shares of ABI common stock prior to that date, because the reasonableness of reliance is determined at the time of the transaction in question. See Hayes v. Gross, 982 F.2d 104, 107 (3d Cir. 1992) (requiring an investor to rely on an alleged misrepresentation at the time of the purchase or the sale of securities); Zlotnik, 836 F.2d at 823 (same); Gannon v. Continental Ins. Co., 920 F. Supp. 566, 578 (D.N.J. 1996) (holding that an investor cannot rely on statements that are made subsequent to the purchase of securities).

To the extent that the defendant's arguments suggest that it is unreasonable as a matter of law to rely on information concerning a tender offer or a merger before the transaction is finalized, we disagree. The Supreme Court has cautioned that "[n]o particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material." Basic, Inc., 485 U.S. at 239. And, other courts have similarly held that information concerning a tender offer may be material while the transaction is still in the planning stage. Maio, 51 F.3d at 637; Mayhew, 916 F. Supp. at 131. If it may be reasonable for an investor to find information concerning a tentative tender offer or a merger important when making an investment decision, we see no reason why the conditional nature of those transactions should necessarily prevent the investor from reasonably

24

relying on that information as well. See 2 Thomas Lee Hazen, The Law of Securities RegulationS 13.5B, at 527 (3d ed. 1995) (stating that "[t]he reliance requirement is a corollary of materiality").

We are also persuaded that the Class members who purchased shares of ABI common stock between March 3, 1998 and April 15, 1998 alleged sufficient facts to satisfy the element of reliance. With respect to those purchasers, the defendants maintain that AIG's $58 tender offer provided an independent valuation of ABI common stock upon which the Class members directly or indirectly relied. In effect, the defendants suggest that the market did not incorporate the alleged misrepresentations into the price of ABI common stock during the competing tender offer, and that the Class members would have purchased shares of ABI common stock to tender to AIG even if they had known the truth about Cendant. See Basic, Inc., 485 U.S. at 249 (noting that the presumption of indirect actual reliance may be rebutted by showing that the plaintiff would have completed the transaction regardless of the alleged misrepresentations); Zlotnik, 836 F.2d at 822 (stating that the presumption of indirect actual reliance may be rebutted by showing that the market price was not affected by the alleged misrepresentations). While those arguments are facially appealing, we do not find them persuasive given the procedural posture of this case.

In reviewing a motion to dismiss under Rule 12(b)(6), we must accept the allegations of the complaint as true and draw all reasonable inferences in the light most favorable to the plaintiffs. See Wiener, 129 F.3d at 315. In this case, the Class's complaint alleges that the market price of ABI common stock was inflated due to the alleged misrepresentations, and it states that the Class purchased "ABI shares believing they would receive $58 per share . . . in a combination of cash and Cendant stock." Though we agree with the defendants that the market price of ABI common stock incorporated information concerning AIG's $58 tender offer, we may not assume for the present purposes that it did not also incorporate information concerning a potential acquisition by Cendant, or that Cendant's tender offer did not have an actual effect on the

25

Class. Indeed, it is likely that the shares of ABI common stock traded at a relative premium during the competing tender offer based on the fact that two purportedly willing and able suitors sought to acquire the company. It is also possible that members of the Class would not have purchased shares of ABI common stock had they been unable to exchange them for shares of Cendant. Because we must assume the truth of the allegations of the complaint, and resolve all competing allegations and inferences in favor of the Class, we agree that the existence of a competing tender offer did not effect the Class's reliance on the defendants' alleged misrepresentations. See In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1420 (stating that a court must credit the allegations of the complaint and not the defendant's responses when resolving conflicting allegations on a motion to dismiss). We also note that the effect of the $58 tender offer would have been limited to those members of the Class who purchased shares from March 3, 1998, when the tender offer was made, and March 17, 1998, when Cendant raised its bid price to $67 per share.

We agree that the Class has failed to demonstrate that it was reasonable for its members to rely on the defendants' prior financial statements and auditors' reports following the April 15, 1998 disclosure of the accounting irregularities. The complaint states that Cendant disclosed on April 15, 1998 that it had uncovered accounting irregularities, and that it warned investors not to rely on its prior financial statements and auditor's reports when making an investment decision.[10] The complaint further alleges that the common stock of both Cendant and ABI traded in an efficient market, and that the market price of each stock instantly dropped after Cendant issued the warning.[11] In light of the curative nature of the warning

_____

10. The April 15, 1998 announcement, which wasfiled as an exhibit to an amendment to Cendant's Schedule 14D-1, warned:

    In accordance with SAS No. 1, the Company's previously issued financial statements and auditors' reports should not be relied upon. Revised financial statements and auditors' reports will be issued upon completion of the investigations.

11. The complaint states that the market price of ABI common stock dropped eleven percent, from $64-7/8 to $57-3/4, following the

statement, and given the instantaneous decline in the market price of both companies' common stock, we conclude that the announcement immediately rendered the prior misrepresentations concerning Cendant's financial condition thereafter immaterial as a matter of law. See Weiner, 129 F.3d at 321 (holding that a public statement curing the misleading effect of a prior misrepresentation renders the prior misrepresentation immaterial); In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1425 (stating that an efficient market immediately incorporates information into the price of a security); Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 530 (7th Cir. 1985) (dicta) (stating that an investor may not ask a court to focus on a misrepresentation and ignore information that has already been disseminated). Thus, neither the market nor the Class members could have reasonably relied upon Cendant's prior financial statements or its audit reports after April 15, 1998. Because it made no misrepresentations after the curative statement was issued, Ernst & Young may not be held liable to members of the Class who purchased shares of ABI common stock after April 15, 1998.

Nevertheless, we do not accept the defendants' contention that the Class could not have reasonably relied on the alleged misrepresentations that were included in the April 15, 1998 announcement. The Class claims that the April 15, 1998 announcement misrepresented Cendant's financial condition by stating that the company expected to restate its 1997 earnings by $0.11 to $0.13 per share and to reduce its net income prior to restructuring and unusual charges by approximately $100 to $115 million. The defendants claim that the Class was not entitled to rely on those statements or on any subsequent statements, because the announcement warned that the representations were subject to "known and unknown risks and uncertainties including, but not limited to, the outcome

_____

disclosure of the accounting irregularities, and that the market price of Cendant common stock plummeted forty-six percent, from $35-10/16 to $19-1/16, following the disclosure.

27

of the Audit Committee's investigation."12 Their argument is based upon both the bespeaks caution doctrine, which renders alleged misrepresentations immaterial, and the common sense principle that investors do not act reasonably in relying on statements that are accompanied by meaningful cautionary language.

The parties disagree as to whether the bespeaks caution doctrine applies to the statements made in the April 15, 1998 announcement that predicted the amount by which Cendant would restate its results for the 1997 year. The Class and the SEC maintain that the "bespeaks caution" doctrine is inapplicable, because the statements related to present and historical facts that were capable of verification and, as such, not forward-looking. See Grossman v. Novell, Inc., 120 F.3d 1112, 1123 (10th Cir. 1997) (holding that the bespeaks caution doctrine applies only to forward-looking information). The defendants, in contrast, characterize the statements concerning the restatement as forward-looking, and thus subject to the bespeaks caution doctrine, because Cendant had not completed a reaudit when it disclosed the amount of the anticipated restatement. See Harris v. Ivax Corp., 182 F.3d 799, 802-3 (11th Cir. 1999) (holding that statements made on the last day of a quarter concerning the results for the quarter are forward-looking).

We need not decide whether the alleged misrepresentations in the April 15, 1998 announcement were forward-looking statements, however, because we conclude that the accompanying warnings were not sufficiently cautionary to warn against the danger of relying on the specific numbers identified in the announcement. In

_____

12. We note that the Private Securities Litigation Reform Act's safeharbor for forward-looking statements does not apply in this case. See 15 U.S.C. S 78u-5(i)(A)-(B). The alleged misrepresentations were made in conjunction with a tender offer and were attached as exhibits to Cendant's Schedule 14D-1 and the amendments thereto. The safeharbor expressly states that it is inapplicable to statements made in connection with a tender offer, except "to the extent otherwise specifically provided by rule, regulation, or order of the [SEC]." Id. Because the SEC has yet to extend the safeharbor to tender offers by rule, regulation, or order, we
do not discuss the defendants' contentions that their statements were also protected under the safeharbor.

28

In re Trump Casino Sec. Litig., 7 F.3d 357, 369 (3d Cir. 1993), this court instructed that cautionary language must be "extensive yet specific" to prevent a reasonable investor from relying on specific projections. There, the court explained:

> a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge.

Id. at 371-72. In Kline v. First Western Gov't Sec., Inc., 24 F.3d 480, 489 (3d Cir. 1994), this court clarified that "Trump requires that the language bespeaking caution relate directly to that by which plaintiffs claim to have been misled."

In the present case, the cautionary language set forth in the April 15, 1998 announcement generally pertains only to the risk that the results of operations could vary in future fiscal years.13 In fact, the only risk factor that is apparently

_____

13. The cautionary language states, in relevant part:

> Certain matters discussed in the news release are forward-looking statements, as defined in the Private Securities Litigation Reform Act of 1995. Such forward-looking statements are subject to a number of known and unknown risks and uncertainties including, but not limited to, the outcome of the Audit Committee's investigation; uncertainty as to the Company's future profitability; the Company's ability to develop and implement operational andfinancial systems to manage rapidly growing operations; competition in the Company's existing and potential future lines of businesses ; the Company's ability to integrate and operate successfully acquired businesses and the risks associated with such businesses; the Company's growth strategy and for the Company to operate within the limitations imposed by financing arrangements; uncertainty as to the future profitability of acquired businesses; and other factors. Other factors and assumptions not identified above were also involved in the derivation of these forward-looking statements, and the failure of such other assumptions to be realized as well as other factors may also cause actual results to differ materially from those projected.

(emphasis added).

applicable to the restatement of Cendant's results for the 1997 fiscal year relates to the risk that the announcement's calculations might differ from those made by the Audit Committee. We are not persuaded that such a general statement of risk is sufficiently substantive and tailored to satisfy the requirements of the bespeaks caution doctrine. See In re Trump Casino Sec. Litig., 7 F.3d at 371-72. Nor are we persuaded that it is adequate to give investors reasonable notice that the projected restatement of Cendant's financial statements should not be trusted so as to make any reliance unreasonable as a matter of law. In our opinion, a reasonable investor may be willing to rely on the announcement's specific calculations concerning the restatement in the absence of a more detailed explanation of the reasons that the calculations might be incorrect and of the effect of any error. The announcement's blanket warning--that the amount of the restatement could later turn out to be wrong--was simply not sufficient to caution reasonable investors against relying on the defendants' representations. See Kline, 24 F.3d at 489-90 (holding that cautionary statements in an opinion letter were not sufficiently cautionary to preclude reliance where they suggested nothing more than the possibility that the speaker "might have gotten the law wrong or incorrectly assessed the risk that the IRS would deny deductions"); see, e.g., Harris, 182 F.3d at 810, 813-14 (setting forth meaningful and specific cautionary language as an appendix to the opinion). Because we conclude that the alleged misrepresentations concerning the restatement of Cendant's 1997 financial information did not include sufficient cautionary language, we agree that the Class could reasonably rely on the anticipated restatement in the April 15, 1998 announcement. For the same reason, we conclude that the Class members were not necessarily prevented from reasonably relying on the defendants' subsequent statements concerning Cendant's intent to merge with ABI.

The Class was not entitled, however, to rely indefinitely upon the April 15, 1998 misrepresentations. Cendant announced on July 14, 1998 that it had revised the restatement of its 1997 income, and it disseminated the formal results of the Audit Committee's investigation one

30

month later. We think that it is possible that either, if not both, of those announcements might have cured the effect of the alleged misrepresentations in the April 15, 1998 announcement and rendered the disclosure thereafter unreliable. However, in light of our decision to remand this case, and given that the parties have not discussed the issue, we leave it for the district court to decide in the first instance the point at which the particular misrepresentations could no longer be trusted.

C.

Finally, we must decide whether the Class's complaint adequately pleads the element of loss causation. The defendants contend that the complaint failed to allege sufficient facts to support an inference that the alleged misrepresentations were the proximate cause of the Class's loss. They maintain that the complaint shows that several intervening events, and not the alleged misrepresentations, led first to the artificial inflation and then to the decline in the market price of ABI common stock. In particular, they assert that the price of ABI common stock was inflated by AIG's $58 tender offer and by the approval of the merger agreement by the board of directors of ABI. They also suggest that the Class's loss was actually caused by the mutual termination of the merger agreement by the board of directors of both ABI and Cendant. We disagree.

In Scattergood v. Perelman, 945 F.2d 618, 624 (3d Cir. 1991), this court held that a plaintiff may establish the element of loss causation simply by showing that he or she purchased a security at a market price that was artificially inflated due to a fraudulent misrepresentation. Id. In that case, the defendants issued a press release stating that they were considering acquiring the outstanding shares of another company at the prevailing market price. See id. at 623. The press release also warned that the defendants had "not yet determined to proceed with such transaction," and it cautioned that there could "be no assurance that [the defendants] will ultimately decide to make such an offer or that the [board of directors of the target corporation] would recommend such an offer to the stockholders." Id. Some of the plaintiffs purchased shares of the target company's

stock at price below the tender offer price expecting that the stock would be acquired at the tender offer price in the near future. See id. at 624. The defendants moved to dismiss the complaint pursuant to Rule 12(b)(6), because the complaint lacked an assertion that "the plaintiffs experienced an economic loss as a proximate result of the alleged Rule 10b-5 violation." Id. The district court granted the motion to dismiss, and this court reversed. This court held that "the fair inference of the complaint, if one assumes--as we must--the truth of its allegations, is that the market price paid by the plaintiffs exceeded the value of the stock at the time of purchase based on the facts." Id. It reasoned that the dismissal was improper, because the complaint suggested that the price paid exceeded the value that the market would have established for the target company's shares had the truth been known. See id. The court expressed no opinion concerning the proper method for measuring the plaintiffs' injury. See id. at 624 n.2.

This court reached a similar conclusion in Hayes v. Gross, 982 F.2d 104, 107 (3d Cir. 1992). There, an investor filed a class action lawsuit against the directors and officers of a savings and loan association pursuant to S 10(b) and Rule 10b-5 claiming that the class members were injured when they purchased the association's stock at an inflated price. See id. at 105. At the urging of the directors, the officers, and the Resolution Trust Company, the district court dismissed the action for failure to state a claim. See id. at 105. This court reversed the dismissal and remanded the matter for further proceedings. It concluded that the class had established the element of reliance, and it expressly found "no merit" in the Resolution Trust Company's contention that the complaint failed to allege the element of loss causation. See id. at 107 & n.2. In holding that the complaint stated a claim under S 10(b) and Rule 10b-5, the court explained:

> Plaintiff alleges that defendants knowingly or recklessly made material misrepresentations which inflated the market price for Bell stock, and that he relied on the market price as reflecting Bell's true value. As a result, plaintiff claims to have suffered injury as a stock purchaser.

32

Id. at 107.

We interpret Scattergood and Hayes as holding that, where the claimed loss involves the purchase of a security at a price that is inflated due to an alleged misrepresentation, there is a sufficient causal nexus between the loss and the alleged misrepresentation to satisfy the loss causation requirement. Cf. Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 297 (3d Cir. 1991) (stating that the difference between the purchase price and the "true value" of the security at the time of the purchase is the "proper measure of damages to reflect the loss proximately caused by the defendants' deceit") (quoting Huddleston v. Herman & MacClean, 640 F.2d 534, 555 (5th Cir. 1981) modified on other grounds, 459 U.S. 375 (1983)). We note, however, that those decisions assume that the artificial inflation was actually "lost" due to the alleged fraud. Where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation. In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price. See Green v. Occidental Petroleum Corp., 541 F.2d 1335, 1345 (9th Cir. 1976) (Sneed, J., concurring) (stating that an investor's proximate losses are limited to those amounts that are attributable to the unrecovered inflation in the purchase price). Because a plaintiff in an action under S 10(b) and Rule 10b-5 must prove that he or she suffered an actual economic loss, we are persuaded that an investor must also establish that the alleged misrepresentations proximately caused the decline in the security's value to satisfy the element of loss causation.

We find the Eleventh Circuit's decision in Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1448 (11th Cir. 1997), instructive of this point. In that case, a group of investors filed a class action lawsuit against Kroger Properties, Inc. ("KPI"), its officers, and its independent accountant pursuant to S 10(b) and Rule 10b-5 when the price of KPI stock dropped following a dividend cut. See id.

33

at 1445. Only the suit against the independent accountant proceeded to trial. See id. At trial, the investors presented evidence that the independent accounting firm made fraudulent statements which inflated the price at which they purchased KPI stock. See id. at 1445–46. It was also shown, however, that the dividend cut and the drop in the price of KPI stock occurred more than one year before the fraud was uncovered, and that the board of directors cut the dividend for reasons unrelated to the alleged fraud. See id. at 1445, 1448. The independent accountant moved for judgment as a matter of law, contending that the investors had failed to prove the essential element of loss causation. See id. at 1446. The district court denied the accountant's motion, and the Eleventh Circuit reversed. See id. at 1446, 1449. The Eleventh Circuit held that the investors had failed to satisfy the loss causation requirement, because they did not present evidence that the artificial inflation was removed from the market price of KPI stock, thereby causing a loss. See id. at 1446. In entering judgment in favor of the accountant, the court noted that the misrepresentations were not discovered until more than one year after the drop in the stock price, and that the investors had not presented any evidence that the cut in dividends, which led to the drop in price, was related to the alleged misrepresentations. See id. at 1446–47.

Turning to the complaint at issue in this case, we are persuaded that the Class has alleged sufficient facts to show that the alleged misrepresentations proximately caused the claimed loss. The Class contends that it purchased shares of ABI common stock at a price that was inflated due to the alleged misrepresentations, and that it suffered a loss when the truth was made known and the price of ABI common stock returned to its true value. The complaint states, in relevant part:

> 94. As a result of the Cendant Defendants' fraudulent conduct as alleged herein, the prices at which ABI securities traded were artificially inflated throughout the Class Period. When plaintiff and the other members of the Class purchased their ABI securities, the true value of such securities was substantially lower than the prices paid by plaintiff and

34

the other members of the Class. The market price of ABI common stock declined sharply from its March 23, 1998, $64-7/16 per share closing price, to its September 29, 1998, $43 per share closing price. By October 13, 1998, ABI's closing price dropped to $35-1/2. In ignorance of the materially false and misleading nature of the statements and documents complained of herein, as well as of the adverse, undisclosed information known to defendants, plaintiff and the other members of the Class relied, to their detriment on such statements and documents, and/or on the integrity of the market, in purchasing their ABI common stock at artificially inflated prices during the Class Period. Had plaintiff and the other members of the Class known the truth, they would not have taken such action.

95. At all relevant times, the misrepresentations and omissions particularized in this Amended Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by plaintiff and the other members of the Class. The misstatements and omissions complained of herein had the effect of creating in the market an unrealistically positive assessment of Cendant, as well as of its financial condition, causing ABI's common stock to be overvalued and artificially inflated at all relevant times. Defendants' false portrayal, during the Class Period, of the Company's operations and prospects, as well as of Cendant's financial condition, resulted in purchases of ABI securities by plaintiff and by the other members of the Class at artificially inflated prices measured by the difference between the market prices and the actual value of such securities at the time of purchase, thus causing the damages complained of herein.

* * *

97. As a direct and proximate result of defendants' aforesaid wrongful conduct during the Class Period, plaintiff and other members of the Class have suffered substantial damages in connection with their purchases of ABI common stock.

35

The complaint further indicates that the price of ABI common stock was "buoyed" by the defendants alleged misrepresentations, and that it dropped in response to disclosure of the alleged misrepresentations and the termination of the merger agreement. Assuming the truth of those allegations, and taking all reasonable inferences in the light most favorable to the Class, we agree that the Class is entitled to offer evidence to support its claim.

Notwithstanding the allegations of the complaint, however, the defendants maintain that the price of ABI common stock was inflated, not by the alleged misrepresentations, but rather by AIG's $58 tender offer and by the approval of the merger agreement by the board of directors of ABI. We do not agree. The Class period covers persons who purchased shares of ABI common stock prior to both events. For those purchasers, neither the competing tender offer nor the board approval of the merger agreement could have provided an independent valuation that would have inflated the price of ABI common stock.

Nor can we say, for the Class members who purchased shares of ABI common stock after that time, that the announcement of AIG's $58 bid and the approval of the merger agreement were sufficient to destroy the causal connection between the alleged misrepresentations and the artificial inflation in the price of ABI common stock. It is well established that not every intervening event is sufficient to break the chain of causation. See Rankow v. First Chicago Corp., 870 F.2d 356, 367 (7th Cir. 1989) (stating that to allow any intervening change in market conditions not directly caused by the defendant to break the chain of causation and exempt the defendant from liability would eviscerate Rule 10b-5); W. Page Keeton et al., Prosser & Keeton on the Law of Torts S 44 (5th ed. 1984) (explaining that proximate causation is not destroyed by every intervening event). So long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing forces will not bar recovery. See Robbins, 116 F.3d at 1447 n.5. While we are mindful that the defendants may disprove that the Class suffered a loss as a result of the alleged misrepresentations by showing

36

that the misrepresentations were not a substantial factor in setting the price of ABI common stock during the Class period, we disagree that the defendants may do so at this stage of the proceedings. See In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1420 (setting forth the standard for reviewing a motion to dismiss). It is possible that one portion of the inflation was attributable to both the competing tender offer and the board approval of the merger agreement, and that the remaining portion of the inflation was attributable to the alleged misrepresentations. It is equally reasonable to infer that the alleged misrepresentations played a substantial role in the decision of the board of directors of ABI to approve the merger agreement, especially considering the fact that ABI shareholders were to receive Cendant common stock in exchange for their shares of ABI common stock.

We also disagree with the defendants' contention that the mutual termination of the merger agreement was an intervening event that caused the Class's loss. The complaint alleges that the market price of the common stock of both ABI and Cendant declined in response to the alleged fraud. From that allegation, it is reasonable to conclude that the disclosure of the falsity of the alleged misrepresentations played a substantial factor in the termination of the merger agreement. Indeed, it is possible that the board of directors of ABI no longer found it beneficial for its shareholders to exchange shares of ABI common stock for shares of Cendant common stock following the discovery of Cendant's true financial condition. In light of the sharp decline in the price of Cendant common stock, it is also reasonable to infer that the board of directors of Cendant sought to cancel the merger to avoid diluting the shares of its existing shareholders. We therefore agree with the contentions of the Class and conclude that the complaint alleges sufficient facts to establish the element of loss causation.

CONCLUSION

In sum, we conclude that the complaint alleges sufficient facts to establish the elements of reliance and loss causation. We do not resolve, however, whether the

37

complaint also satisfies the "in connection with" requirement; nor do we consider whether the complaint complies with the heightened pleading requirements of Rule 9(b). Rather, we vacate the judgment of the district court and remand this matter so that the district court may determine, in the first instance, whether the alleged misrepresentations were material and publicly disseminated in a reliable medium and, in the case of Ernst & Young, whether it was reasonably foreseeable that Cendant would use its financial statements and audit reports in its tender offer for shares of ABI common stock.14  We also instruct the

---

14. We find no merit in the defendants' claim that the dismissal should be affirmed on the alternative ground that the complaint fails to allege that the defendants shared a "fiduciary or other similar relation of trust and confidence" with the Class members. The complaint does not allege that the defendants failed to disclose material facts. See, e.g., Dirks v. Securities & Exch. Comm'n, 463 U.S. 646, 6611983) (considering whether a tippee was under a duty to disclose inside information or to abstain from trading); Chiarella v. United States, 445 U.S. 222, 228 (1980) (considering whether a financial printer was under a duty to disclose information to shareholders of a corporation for whom he did not work or to abstain from trading in the corporation's securities); Gordon v. Diagnostek, Inc., 812 F. Supp. 57, 60 (E.D. Pa. 1993) (considering whether an acquiring corporation was under a duty to disclose certain financial information to the shareholders of a target corporation); Lerner v. FNB Rochester Corp., 841 F. Supp. 97, 99, 103 (W.D.N.Y. 1993) (considering whether a potential acquirer was under a duty to disclose material information to the shareholders of a target corporation); Gershon v. Wal-Mart Stores, Inc., 901 F. Supp. 128, 129-31 (S.D.N.Y. 1995) (considering whether a corporation was under a duty to disclose to the shareholders of another corporation that it intended to terminate a contract for the sale of goods); Lindlom v. Mobile Telecomm. Technologies Corp., 985 F. Supp. 161, 163 (D.D.C. 1997) (considering whether a subsidiary whose securities were not traded owed a duty to disclose certain information to the shareholders of the parent corporation). Rather, it alleges that the defendants made affirmative misrepresentations. Though defendants who are neither fiduciaries nor insiders generally are not under a duty to disclose material information, they subject themselves to liability under S 10(b) and Rule 10b-5 when they make affirmative misrepresentations. See Deutschman v. Beneficial Corp., 841 F.2d 502, 506 (3d Cir. 1988) (stating that nothing in the law of this circuit "can be construed to require afiduciary relationship between a section 10(b) defendant and the victim of that defendant's affirmative misrepresentation").

38

district court to consider whether the complaint nevertheless should be dismissed for a failure to plead scienter with particularity. Because we do not resolve whether the dismissal was proper under S 10(b) and Rule 10b-5, we do not address the merits of the dismissal of the Class's claim under S 20(a).

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

39